In re C_____.

No. 9055.

Springfield Court of Appeals,
Missouri.

June 11, 1971.

Douglas, Douglas & Douglas, Neosho,
for appellant.

John Sims, Neosho, for respondent.

HOGAN, Judge.

On this appeal, we review a judgment of
the Juvenile Division of the Circuit Court
of Newton County terminating parental
rights to three children, pursuant to §§
211.441, et seq.[1]  At the time the judgment
was entered on May 25, 1970, S_____,
the eldest child, a little girl, was four and
one-half years of age; A_____, a little
boy, was about three; and D_____, a
little girl, was approximately 18 months
old.  C_____, the mother of the chil-
dren, appeals.

The record is very depressing.  The chil-
dren's situation seems to have come to the
attention of the juvenile authorities when
B_____, the father of two of the chil-
dren involved, was charged with sexual
molestation of the eldest child.  While in
custody, he admitted the molestation and
was thereafter sent to State Hospital
No. 1 for psychiatric examination pur-
suant to § 552.020.  B_____ was re-
turned with a report, the record shows,
that "there was nothing wrong mental-
ly," although the hospital authorities noted
that he had admitted molesting the child.
In the course of a statement made at the
time of his arrest, B_____ stated that

1.  All references to statutes and rules, unless otherwise noted, are to R.S.Mo. (1969), V.A.M.S.
and V.A.M.R.

"[t]he last 10 or 15 years when I get around little girls I get excited but I've never molested any until this time. When I live with my wife we have intercourse 2 or 3 times a night almost every night. My wife is 22 years old and we are seperated at this time. S_____ is a stepdaughter of mine. She has been with me since she was about 3 months old." B_____ was present in court with counsel when this statement was received in evidence; during the trial he added to this statement by saying that when he was sent to the state hospital he "couldn't remember nothing," but after his visit there "things got better." After B_____'s conduct came to light, the three children were taken into custody by the juvenile authorities. The little boy, A_____, was placed in a private home, and the two girls were put in custody of the Department of Welfare, apparently on a finding of neglect.

The appellant mother's testimony is rather difficult to follow. She has four children, an "older little boy," in addition to the three involved here. The older boy had "been with his daddy for two years," and appellant did not know where he was. J_____, the appellant's first husband, was the father of this child, and she stated that he was also the father of the oldest of the three children now before the court. Appellant had been married to J_____ "a little over two years," but "he didn't claim" S_____, "* * * said she wasn't his." In any event, when S_____ was three months old the appellant and B_____ "started living together," and lived together "almost four years." The appellant's first husband obtained a divorce—we are not advised when.

The appellant and B_____ were never married, but they became the parents of at least two children, those being the younger two of the children before the court. B_____ and the appellant separated at irregular intervals; appellant testified that B_____ supported the children "what time we was together, but every time I expected a baby he would take me home and

my folks supported me and the children." Apparently during one of these periods of separation, appellant was married to one G_____, but "he had it annulled * * * after about a month." Nevertheless, appellant used his name as the father of her two youngest children on their birth certificates. She testified upon trial, however, that B_____ was their father.

In July 1969, appellant married again, this time to a man named James, which we take to be his given name. Shortly before Thanksgiving in 1969, appellant was in contact with B_____ by telephone, and "he said he would like to see the children." Appellant then went "to my mother's and she brought them [to Missouri], come with me." B_____ was going to keep the children, appellant said, "[t]wo or three weeks." Her present husband "wasn't too happy" about her coming to Missouri, but she came, and stayed "about a week" in an apartment with B_____ and the children, although she testified that she had no sexual relations with B_____ during that time. Appellant maintained that she told her present husband about staying with B_____, and he "trusted her."

B_____ tried to "get [appellant] to come back," but she returned to her present husband. About Christmas 1969, appellant addressed a letter to B_____, which is in part:

"Honey, I don't know exactly how to say this. I won't be coming home except to get the kids. *I was really planning on coming back until just a day ago.* James called me and wants me to come back to him. I am so sorry but I told you that I love him. Please don't be made [sic] at me. *We couldn't be happy with me in love with someone else.* It is to be a little while before I can come after the kids. I think I will let them stay until after Christmas so you can spend Christmas with them. And please buy them Christmas * * *." (Our emphasis.)

Shortly thereafter, appellant sent B_____ still another letter, which was in part:

> "Here is some presents for the babies. Don't give them to them until Christmas. * * * If you come to Luccock [sic] Christmas, if you can take the kids to Pecos to Bobby and Mary's house, the address is 114 Oak. And if you can't find that, take them to Sandy's 115 W. 10th. *They will get ahold of me and I will come and get the babies.* If you don't come down Christmas I will come up there and get them after Christmas. *I don't know where I will be the next two weeks.* * * * Please don't be mad. See you soon as possible. * * *" (Our emphasis.)

As for her present situation, the appellant testified that she and her husband lived in Elk City, Oklahoma. James did "seismograph" work. The appellant did not work. Appellant and James had no home, and had lived in three places in the past year. James' mother lived at San Angelo, Texas, and that was where they were going to go later, "I imagine." Appellant believed it would be sufficient if she and James "settled" in one place "when the kids get old enough to go to school." Appellant and James had taken care of the children from July 1969 until "about Thanksgiving" of that year.

The principal argument made in this court by the appellant is that she has not been guilty of any misconduct which justifies complete termination of her parental rights. In her brief filed here, appellant concedes that she has led a rather "hectic" life, but maintains that it was not the intention of the General Assembly to terminate the parental rights of all parents who "may have been promiscuous" in their lives, and that at most she was guilty of bad judgment when she agreed to let her children go and stay with B_____. Citing In re Taylor, Mo.App., 419 S.W.2d 473, and Renfro v. Jackson County Juvenile Court, Mo.App., 369 S.W.2d 616, the appellant reminds us that a parent has the primary right to custody of his (or her) children "as against the world."

Our courts have uniformly recognized the gravity of the proceeding authorized by § 211.441,[2] and it seems scarcely necessary to re-emphasize the awesome nature of the power conferred upon the courts by the termination statutes, or the necessity for strict and literal compliance with the statutory requirements. Section 211.441 contemplates a complete and final severance of all legal rights, privileges, duties and obligations of the parent and child with respect to each other, and the replacement of the natural parent by another guardian or an adoptive parent, and the procedure authorized by § 211.441 is not designed to deal with ordinary problems of immediate custody or supervision. In re M_____, supra, 393 S.W.2d at 115–116, and materials cited marginally note 5. This court has consistently held to the view that neither past neglect of parental duty nor isolated transgressions against the moral law necessarily render an individual person unfit to have custody of his or her child, see I_____ v. B_____, Mo. App., 305 S.W.2d 713, 718, and we cordially agree with the suggestion that those transitory failures and derelictions of parental duty which justify temporary deprivation of parental custody and supervision are seldom grounds for complete termination of parental rights.[3] We are unable to discern, however, any basic dissimilarity between those qualities, or lack of them, which render a parent unfit under the provisions of § 211.441 and those which render him or her unfit in any other proceeding involving the custody of children. The

2. In re M_____, Mo.App., 446 S.W.2d 508, 511–512 [2, 3] [4–6]; In re Taylor, supra, 419 S.W.2d at 475–476 [1, 2]; In re M_____, Mo.App., 393 S.W.2d 109, 115–116 [8] [9] [10]; Renfro v. Jack-son County Juvenile Court, supra, 369 S. W.2d at 621 [2–4].

3. See Note, Infants—Termination of Parental Rights, 14 Kan.L.Rev. 117, 118–119 (1965).

difference is simply one of degree, and if the evidence shows clearly and convincingly that the parental misconduct or neglect is substantial and continuous or repeated over a period of one year or more, then the court may terminate the parent's rights. Moreover, the range of problems to be dealt with by the juvenile courts is so broad that any attempt to formulate a specific meaning for each of the grounds listed in § 211.441 would be futile, and would probably tend to frustrate the purpose for which the statute was enacted. See In Interest of Morrison, 259 Iowa 301, 144 N.W. 2d 97, 103–104[11].

■■ We would reiterate, as we stated in I_____ v. B_____, supra, 305 S. W.2d at 718, that it is not our function, in any custody case, to sit in judgment of others with a view to punishing them for their moral transgressions. From time to time, this court has overlooked or tolerated moral misconduct on the part of a parent seeking custody when it has appeared that the child has not and probably would not be deleteriously affected by the parent's behavior, as for example in Stockton v. Guthary, Mo.App., 415 S.W.2d 308. This record, however, does not present a case in which the parent has merely been guilty of occasional misconduct. In candor, the appellant has simply drifted from one man to another, sometimes marrying one of them for a short period. The appellant has been promiscuous in the sense that that word means improperly indiscriminate in sexual relations, and her promiscuity has amounted to a continued course of conduct over a period of several years. The record permits the inference, as the trial court indicated in its findings, that the appellant may not be sure which of the men with whom she has lived is actually the father of her children. It has repeatedly been held in this state and elsewhere that proof of adultery amounting to promiscuity establishes parental unfitness in actions for the custody of children,[4] and in our view, it may also establish unfitness in a proceeding to terminate parental rights, at least where, as here, there appears to be little likelihood of self-rehabilitation by the parent, and it appears probable that the child will be subjected to substantial immoral and debasing influences if left with the offending parent. In re Morrison, supra, 259 Iowa 301, 144 N.W.2d at 102–103 [6] [7–9]; In re Welfare of Three Minors, 50 Wash.2d 653, 314 P.2d 423, 427 [11, 12]; In re Johnson, 9 Wis.2d 65, 100 N.W.2d 383, 390 [14, 15]. The trial court found that the parents of these children were unfit by reason of their debauchery and repeated lewd and lascivious behavior. In our opinion, the judgment could be justified on that ground alone.

There are other factors to be considered. Although the appellant testified on trial that she loved her children and that "[t]hey're my life," she did not even know where one of her children was, except to say that "* * * he has been with his daddy for two years." She has never established or maintained a home of any kind, unless it could be said that during the time she lived with B_____ she and her children enjoyed temporary shelter until she became pregnant. Appellant and her present husband had no home, and no definite plans to establish one. The correspondence we have quoted is subject to the interpretation that for a time the appellant contemplated leaving James and returning to B_____. Having taken the children to stay with B_____, appellant left, and advised him to return the children to "Bobby and Mary's house," or to "Sandy's," because she didn't "know where I will be the next two weeks." Moreover, we find it difficult to believe that the appellant did not have *some* knowledge or indication of B_____'s sexual propensities when she

4.  Yount v. Yount, Mo.App., 366 S.W.2d 744, 748–749 [7] [8]; I_____ v. B_____, supra, 305 S.W.2d at 718; Graves v. Wooden, Mo.App., 291 S.W.2d 665, 669 [5]; see generally Note, The Custody Question and Child Neglect Rehearings, 35 U.Chi.L.Rev. 478, 485 (1968).

left the children with him unattended, although we cannot of course say that she anticipated the actual molestation of the eldest. As pointed out elsewhere, the term "neglect" is a general and "a negative proposition, [meaning] simply the failure to perform the duty with which [a] parent is charged by the law and by conscience," In re C., C., and C., Mo.App., 380 S.W.2d 510, 515, although of course a finding of "willful" neglect must exclude acts which occur because of events which are beyond the control of the parent and which are not his fault. In re Taylor, supra, 419 S. W.2d at 476 [3, 4]; In re C., C., and C., supra, 380 S.W.2d at 515. We are of the opinion nevertheless that the trial court could properly have found appellant guilty of willful and substantial neglect of her children within the meaning of § 211.441, subsection (b), as it did. The appellant has made no effort to provide her children with a relatively stable environment, let alone a home in which they might be reared in more or less normal circumstances. She has made no effort to secure a source of support for them; they have been dependent upon the bounty of the individual with whom the appellant was living at the moment. While we would not, as we pointed out in Stockton v. Guthary, supra, 415 S.W.2d at 312, undertake to enumerate or assign relative importance to the factors to be considered in determining the fitness of a parent as custodian of his child, it does seem to us that a parent has a duty to attempt to provide his child with a home in which the child will be housed, fed, clothed and educated, at least according to acceptable community standards. The appellant has not provided such a home in this case, or even an acceptable substitute, as was shown, for example, in State v. Greer, Mo.App., 311 S.W.2d 49. All that we may expect here, if these children are left with the appellant, is that they will become public charges.

We do not overlook the necessity for strict compliance with the procedural requirements of §§ 211.441, et seq., in an action to terminate parental rights, but we have examined the record carefully and find that no basic procedural rights of the parties were infringed. A petition was filed in the juvenile court as required by § 211.451, and in our opinion it conforms to and states the essential facts required to be alleged by that statute. The appellant, B._____, and two of the appellant's former husbands (including the father of the eldest child) were served with process as required by § 211.461. The appellant filed an answer and appeared in person and with counsel at an evidentiary hearing; she had the opportunity to produce witnesses and confront those produced by the State. A record was made as required by § 211.481, subsection (2). The trial court made and entered an order in writing terminating parental rights, and it conforms to § 211.511. The appellant was represented by counsel on this appeal, and we have reviewed the case fully upon the record. We find no reversible error, procedural or substantive, and the judgment is affirmed.

TITUS, P. J., and STONE, J., concur.