**In the Interest of S. K. L. et al., Appellants,**

v.

**Ralph L. SMITH, Juvenile Officer of the Juvenile Court of the County of St. Louis, Petitioner, Respondent.**

**No. 34322.**

Missouri Court of Appeals, St. Louis District.

March 28, 1972.

Motion for Rehearing or for Transfer to Supreme Court Denied April 26, 1972.

Application to Transfer Denied June 13, 1972.

Harold E. Scheppner, Jr., David A. Lander, Clayton, for appellants.

Corinne R. Goodman, Miriam T. Bricker, Clayton, for respondent.

SIMEONE, Judge.

This is a proceeding under §§ 211.441 to 211.511, RSMo 1969, V.A.M.S.,[1] in which the Juvenile Officer of St. Louis County filed proceedings seeking to terminate the parental rights of the mother with reference to her three minor children. In each of these cases, which were consolidated on trial below and now on appeal, the Circuit Court, Juvenile Division, of St. Louis County entered its order terminating the parental rights of the mother and she has appealed.

On December 14, 1970, the Juvenile Officer of St. Louis County Juvenile Court filed petitions in the Juvenile Court to terminate the rights of the parents to the three children, S.K.L., G.W.L. and C.L.L., on the grounds that the parents have "abandoned" said children and have "wilfully, substantially and continuously or repeatedly neglected said child[ren] and refused to give said child[ren] necessary care and protection." Summons was duly served on the mother and publication of notice was given to the father.

The three children were respectively 7, 9 and 11 years of age at the time of the hearing. S.K.L. was born on December 26, 1960; G.W.L. was born on October 14, 1962; and C.L.L. was born on October 24, 1964.[2]

In December, 1968, the three children were placed in foster care and have been in the custody of Family Services, St. Louis County Welfare Office and have been supported by ADC–FC funds of the State of Missouri.

Trial was held on June 8, 1971. The evidence of the Juvenile Officer consisted of the testimony of two social workers. Miss Ann Middleton, a social worker with Family Services since August of 1969, having graduated with a degree in social behavioral science the previous June, was the worker for C.L.L. and G.W.L. Miss Terry Fillmore was the worker assigned to S.K.L. The evidence of Miss Middleton showed that there were some thirteen contacts with the mother over the period of the year in question, December 14, 1969–December 14, 1970. These contacts of Miss Middleton with the mother show, in substance, that on various occasions the mother did not request to see or visit her children; that she did not send clothes, gifts or birthday cards to her children; that in December, 1969, she did not respond to a get-well card and Christmas card which her son sent to her while in the hospital after being encouraged to do so by Miss Middleton. Miss Middleton testified that "I feel that the children have very good potential and they are doing well in foster care. I don't feel that Mrs. L . . . is able to provide them the stability and the stimulation and incentive they need to perform to capacity. I think they would be better off in an adoptive home." The evidence shows that the mother was often in a hospital for leg ulcers and varicose veins.

Miss Fillmore, the social worker for S.K.L., testified that there were no telephone calls or gifts or messages or presents of any kind for the children and that the mother never requested to visit the daughter, S.K.L.

The appellant (mother) who had a sixth grade education with an eighth grade equivalency and her oldest daughter, Char-

---

1. All references to statutes and rules are to RSMo 1969, V.A.M.S. and V.A.M.R., unless otherwise indicated. For a history of our statutes on termination of parental rights, see In re M., Mo.App., 393 S.W.2d 109, 116 fn. 5–8; In re M., Mo.App., 446 S.W.2d 508, 510, fn. 2. Our termination statutes were adopted for the first time in 1959 by the General Assembly.

2. The mother admitted that another man was the father. No issue was raised as to this fact in the briefs. "[N]either past neglect of parental duty nor isolated transgressions against the moral law necessarily render an individual person unfit to have custody of his or her child . . . ." In re C, Mo.App., 468 S.W.2d 689, 691.

lotte, also testified. The mother attempted to explain some of the reasons why she did not see her children more often. She stated, "I didn't know I could make arrangements for it." She admitted that Miss Middleton asked her "sometimes" why she didn't "get together with your kids" but the mother "didn't think they'd bring them out to the home or anything." She testified that "Sometimes I asked her how they [the children] are." When asked why she didn't ask more frequently about them, she replied she didn't know. During the period between December 14, 1969 and December 14, 1970, she worked as a maid and earned $40.00–$50.00 per week but did not buy presents for the children because "I didn't even know I was supposed to—could—I didn't know if I could send them any." She said that she wanted to have her children back when her legs were better and that she did not ask to see her children because "I thought they were maybe supposed to make the arrangements." The mother stated that she used her crocheting ability to make items both for gifts and for sale and gave them to people she knew "real good." But she never crocheted anything for her children.

On November 16, 1970, when Miss Middleton visited the mother at her home, she discussed the "possibility" of terminating her parental rights to the children. Present at that time was the oldest daughter, Charlotte, age seventeen. Miss Middleton explained that the children had been in foster care for almost two full years and "explained termination to her." She also reviewed the needs of the children, the mother's plans for herself, and her expectations for her children. Charlotte at this time was expecting a child and expressed interest in helping provide a home for the children if this could be arranged. But Miss Middleton felt that this plan was "quite unrealistic."

At the time of the hearing the mother lived in a second story three-room apartment. It had a small kitchen, a small living room and a large bedroom, and "the homemaking standards appear[ed] to be very good."

When asked if she knew the reason for the hearing, the mother replied, "Well, something about the kids is all I know."

On June 14, 1971, the court entered its order terminating the parental rights of the mother on the ground "that it appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the Petition herein that said adult natural mother has abandoned said child and has wilfully, substantially and continuously neglected said child and has refused to give the child necessary care and protection." The court also ordered a hearing after proper service on the termination of the father's parental rights. After motion for rehearing the case was duly appealed to this court.

The mother urges in her brief that the court erred in finding by "clear, cogent and convincing evidence" that for one year or more immediately prior to the filing of the petition that the mother has abandoned the children and wilfully, substantially and continuously neglected and refused to give the children necessary care and protection. The respondent, Juvenile Officer, on the other hand urges that there was "clear, cogent and convincing evidence of abandonment and neglect" and that it was in the best interest and welfare of the children to terminate the parental rights.

The case is before us for review de novo and it is the duty of this court to make our own independent findings of fact and conclusions of law. Rule 73.01(d); Renfro v. Jackson County Juvenile Court, Mo.App., 369 S.W.2d 616, 621; In re M——, Mo.App., 393 S.W.2d 109, 110[1].

Proceedings for termination of parental rights under statutory authority are of the "utmost gravity." In the Interest of D——

J—— A—— v. Smith, Mo.App., St. Louis District, 477 S.W.2d 718, 1972.[3]

■ This court stated in In re Taylor, Mo.App., 419 S.W.2d 473, 475, that "The action for termination of parental rights is designed to extinguish forever the pre-existing legal rights of the parents with respect to their child and is the subject of specialized legislation. The power of the juvenile court to effectuate such a result is in its entirety the creation of the statute; it does not otherwise exist . . . ." The General Assembly and the courts have recognized that both by law and by nature parents have the primary right as against the world to their children. It is an inherent natural right. It is axiomatic therefore, that parents are not to have their rights to their children terminated except upon "clear, cogent and convincing" evidence of one or more of the grave reasons specified by law. In re Taylor, *supra,* at 476. The legislature did not intend by statute to provide that the " . . . relationship of parent and child might be lightly cast aside for any paternalistic sociological theory. Rather, the statute sets out only grave and compelling grounds for the action, essential to the welfare and protection of the child, and it should be so viewed and carefully applied." Renfro v. Jackson County Juvenile Court, *supra,* 369 S.W.2d at 621. Whoever seeks to invoke powers of termination carries the full burden of proof.

■ In 1959, for the first time, our legislature enacted laws specifically authorizing the courts to terminate the rights of a parent. It seems scarcely necessary to re-emphasize that this is an awesome power conferred upon the courts and before it is exercised there must be strict and literal compliance with the statutory scheme. In re C——, Mo.App., 468 S.W.2d 689, 691.

The pertinent statute is § 211.441. It provides: "1. The juvenile court may, upon petition filed as provided in other cases of children coming under the jurisdiction of the court, terminate all rights of parents to a child when it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:

\* \* \* \* \* \*

(2) When it appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the petition

(a) The parents have abandoned the child;

(b) The parents have willfully, substantially and continuously or repeatedly neglected the child and refused to give the child necessary care and protection;

(c) The parents, being financially able, have willfully neglected to provide the child with the necessary subsistence, education or other care necessary for his health, morals or welfare or have neglected to pay for such subsistence, education or other care when legal custody of the child is lodged with others;

(d) The parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the child;

\* \* \* \* \* \*."

Under the statutory provisions the power of the court is dependent upon the existence of one or more of the special conditions.

---

3. See Note, Termination of Parental Rights, 14 U.Kan.L.Rev. 117; See also Legislative Guides for the termination of parental rights and responsibilities and the adoption of children, U.S. Department of Health, Education and Welfare, Publication No. 394–1961.

The cases that have been decided by the courts of this state show that, before termination of parental rights is ordered, there must be grave and compelling reasons. Renfro v. Jackson County Juvenile Court, *supra* (chronic alcoholism); In re M_____, *supra*, (physical violence); In re C, *supra*, (promiscuity and neglect);[4] In re Burgess, Mo.App., 359 S.W.2d 484, (physical abuse and neglect); In re C., C., and C., Mo.App., 380 S.W.2d 510, (adoption case—common drunk and neglect); White v. DeSpain, Mo.App., 453 S.W.2d 697, (horrible living conditions, a neglect case); Drake v. King, Mo.App., 446 S.W. 2d 455, (refusal to care for children); In re J.L.L., Mo.App., 402 S.W.2d 629, (physical abuse and neglect); In the Interest of D—— J—— A—— v. Smith, *supra*, (no abandonment found).

 The basis for the court's order on June 8, 1971, was that the mother had abandoned the children and wilfully, substantially and continuously neglected the children and refused to give the children necessary care and protection. "Abandonment" implies a wilful, positive act such as deserting the child.[5] The wilfulness of neglect on the other hand is more of a negative proposition, or simply the failure to perform the duty with which the parent is charged by law according to acceptable community standards. The neglect,[6] in order to be wilful must be intentional, deliberate and without just cause or excuse. As pointed out elsewhere, the term "neglect" is a general and a negative proposition meaning simply the failure to perform the duty with which a parent is charged by the law and by conscience. Wilful neglect must exclude acts which occur because of events which are beyond the control of the parent and which are not his fault. In re C, *supra*, 468 S.W.2d at 693, citing In re C., C., and C., *supra*, and In re Taylor, *supra*.

 We hold that there was insufficient "clear, cogent and convincing" evidence that the mother in this case abandoned or "willfully, substantially and continuously or repeatedly neglected the child[ren] and refused to give the child[ren] necessary care and protection." § 211.441, subd. 1(b). The mother from her testimony in the record appears to be a confused, handicapped, sickly and uneducated woman, although she did read books and had a sixth grade education. She was constantly in and out of hospitals and clinics for varicose veins and ulcerated legs. She relied on Miss Middleton for all sorts of aid and help.[7] She testified that she

---

4. The mother made no effort to provide a home or even an acceptable substitute. "[A] parent has a duty to attempt to provide his child with a home in which the child will be housed, fed, clothed and educated, at least according to acceptable community standards. The appellant has not provided such a home in this case." "In candor, the appellant has simply drifted from one man to another. . . ." In re C, Mo.App., 468 S.W.2d 689, 693, 692.

5. In In re Slaughter, Mo.App., 290 S.W.2d 408, relying on In re Watson's Adoption, 238 Mo.App., 1104, 195 S.W.2d 331, 336, the court said that abandon means "To relinquish or give up with the intent of never again resuming or claiming one's rights or interests in; to give up absolutely; to desert, as a person to whom one owes a duty, allegiance, or the like."

6. Under § 211.031(1) the Juvenile Court has jurisdiction over children in proceedings because "(a) The parents or other persons legally responsible for the care and support of the child neglect or refuse to provide proper support, education which is required by law. . . ." § 211.441, subd. 1 requires a much stronger test for termination: "(b) The parents have *willfully*, substantially and continuously or repeatedly neglected the child *and refused* to give the child necessary care and protection; . . ." (emphasis added). See also Note, The Custody Question and Child Neglect Rehearings, 35 U.Chi.L.Rev. 478.

7. Kadushin, Child Welfare Services, at 234 reports: "The most successful approach [of social workers] seems to be one that directs itself to situational changes rather

did not understand that she could see her children, or communicate with them or send them gifts. On one occasion when she expressed a desire to visit one of her children in the hospital she was discouraged from doing so by the social worker. On another occasion when her oldest daughter, Charlotte, suggested they try to make a home for the children, the social worker told her that the plan was "quite unrealistic." The mother expressed interest in her children by asking for pictures of the children in foster care; she also requested the hospital visit. The evidence that she merely failed to request to see her children during the critical year, that she did not send gifts and did not respond to a suggestion by the social worker to a gift sent by one of the children does not rise to the status of "clear, cogent and convincing" evidence to terminate *forever* the mother's rights in her children. No challenge was made as to the conduct of the mother. No question was raised as to her morality. She was not charged with abuse of the children. Hence we do not find under the circumstances an abandonment or a wilful, substantial, continuous or repeated neglect and refusal to give the children necessary care and protection.

The respondent relies on In re Slaughter, Mo.App., *supra*. There the appeal was from a decree of adoption rendered by the Juvenile Court under § 453.010, et seq. The natural mother appealed. The petition alleged that a child was declared neglected and dependent and made a ward of the court under the supervision of the state agency for the reason that the natural parents had wilfully abandoned and neglected the child.

The *Slaughter* decision is distinguishable. There was no evidence of any kind

that the mother in *Slaughter* ever attempted to care for the child nor expressed an interest in the child. Here, at least the mother expressed interest in the children on more than one occasion.

We do not believe that the doctrine in *Slaughter* controls under the circumstances of this case. Rather, under the facts in the present case, we find the decision in In re Taylor, *supra*, more persuasive. In that case the court held that where the parents were ignorant of the actual locations in which their children were placed by the Division of Welfare, their failure to maintain active contacts with the children could *not be considered wilful neglect.* In re Taylor, *supra*, 419 S.W.2d at 476.

■ What really is the core issue here is whether or not parental rights may be terminated on the ground that the children would be "better off" in another home.[8] The General Assembly has not authorized such action nor adopted such a statute; it has authorized termination only when there is clear evidence that one or more of the statutory conditions is satisfied. We *do not believe that either we or the Juvenile Court which has done and is doing so* much good for neglected children, has authority to terminate parental rights because the court thinks children would be "better off" with someone else. In the extreme this could lead to a redistribution of a great mass of the minor population.[9] The General Assembly of this State, in its wisdom, has not given courts such authority.

The best interests of the child are of course, to be considered, and are of great importance, but one or more of the conditions specified in § 211.441 must be fulfilled. We hold that the required condi-

than psychological changes. Neglectful parents appear to be childlike in their dependency . . . Like children, they simultaneously welcome and resent being told, in clear, unequivocal terms, what to do. . . . According to Kaufman: 'The worker assumes the role of autonomous ego for these parents. He

adopts a kindly but firm supportive parental role. [50, p. 196].'"

8. Miss Middleton stated that "I think they would be better off in an adoptive home."

9. See the discussion in Simpson, The Unfit Parent, 39 Univ. of Detroit Law Journal, 347, 355.

tions were not satisfied under the facts in this case.

We believe that the overwhelming majority of our Missouri citizens hold the relationship between parent and child to be of the utmost importance, and it is only when grave and compelling reasons exist that that relationship may be severed. We hold that these reasons have not been shown under the facts in this case.

The judgment is reversed.

BRADY, C. J., and DOWD, SMITH and WEIER, JJ., concur.