In the Interest of C. S., a child, E. S., Mother of C. S., Appellant,

v.

Ralph L. SMITH, Juvenile Officer, St. Louis County, Respondent.

No. 34316.

Missouri Court of Appeals, St. Louis District, Division Two.

July 25, 1972.

Harold E. Scheppner, Jr., David A. Lander, Clayton, for appellant.

Corinne Goodman, Legal Advisor, Miriam Bricker, Clayton, for respondent.

DOWD, Presiding Judge.

The Juvenile Court of the Circuit Court of St. Louis County entered a judgment terminating the parental rights of both parents to a minor child. The natural mother appeals.

On March 30, 1971, the Juvenile Officer of St. Louis County Juvenile Court filed a petition in the Juvenile Court to terminate the rights of the parents to C.S. on the grounds "[T]hat the said parents of said minor child, have since on or about March 26, 1970 have abandoned the child and/or have willfully, substantially and continuously or repeatedly neglected the child and refused to give the child necessary care and protection." Summons was duly served on both parents.

Trial was had on June 2, 1971. The evidence of the Juvenile Officer consisted of the testimony of Miss Suzanne Douglass, a social worker with Family Services. Miss Douglass was the case worker assigned to the case. She testified that she was not aware of any contacts between the parents and the child during the period March 30, 1970 to March 31, 1971. On September 8, 1970, the rights of the parents to two of their other children, M.S., and T.S., were terminated. On September 9, 1970, Miss Douglass received a call from Mrs. S. who said she wanted to visit all five of her children. Miss Douglass explained that Mrs. S.'s rights to M.S. and T.S. had been terminated the previous day, whereupon Mrs. S. became "very upset" and hung up.

Miss Douglass further testified that on May 18, 1970, there was a court hearing in reference to Mrs. S.'s oldest daughter. At that time Mr. S. was asked to support C.S. in foster care. However, no support was ever given. C.S. has been supported exclusively by St. Louis County. Miss Doug-

lass visited Mr. and Mrs. S. on April 18, 1970, and there were two court hearings around that time, at which the mother was present. On March 18, 1970, Miss Douglass had also visited Mr. and Mrs. S., with a financial form, and at that time attempted to get support for C.S. However, there was nothing on the form to indicate the amount of support needed or required. Miss Douglass was then permitted to testify as to the contents of a psychologist's report evaluating Mrs. S.'s mental capacity. The report showed a defective range of intellectual functioning, with an I.Q. of 62.

Miss Douglass admitted that she never explained to Mrs. S. the possible consequences of the latter's failure to support C.S. But at the April 18, 1970 meeting, she stated she did explain the consequences with regard to M.S. There was never any indication given to Mrs. S. that this petition to terminate her rights to C.S. was going to be filed. C.S. is now 10 years old and has been in foster care since 1968.

Appellant's evidence consisted of the testimony of Mrs. S. Her husband did not appear. When asked why she didn't try to see C.S. between March 30, 1970 and March 31, 1971, Mrs. S. replied, "Because, when I called her, she said I couldn't see them at all, is what she said; said I couldn't see none of my children at all, is what she told me. * * *"

The following questions and answers were given:

"Q   Did you want to see them?

"A   Yes, I did, want to see them, awful bad. I haven't seen them for three years and I think it is about time I got the right to have them all back so I can take care of them before I die.

"Q   Did you send them any gifts, Mrs. S.?

"A   No, I couldn't because I didn't have no address to send them. I would send them gifts, and money, and things like that, but I didn't have—I didn't

know where to send it to. She never explained where to send it or anything.

"Q   Did you feel as though you were getting along well with Mrs. Douglass?

"A   No. I never did get along with her at all because I think I got a dirty deal over the whole mess.

*     *     *     *     *     *

"Q * * * Mrs. S., why did you let the Welfare people have your children in the first place?

"A   I didn't. I didn't, Mr. Scheppner. My mom had threatened me. My mom had called the Welfare and gotten my kids taken away. I don't know why. She just threatened me that—she just threatened me that she was going to get my kids taken away and sure enough she had gotten them taken away from me and ever since, I haven't seen them at all, haven't seen them for three or four years now and I think I got the right to have them back and take care of them before I die.

"Q   Mrs. S., how far in school did you go?

"A   Only through the eighth grade and then my mom had found in the paper about the night school so I went to night school and learned a little more in night school."

Mrs. S. further testified that no one ever told her to send money for the children's support, and no one would let her see the children at all. This included the April 18, 1970 meeting. At one time her mother was helping to support the S. family. The parents are presently living in a two room furnished apartment, but, although they can afford a larger place, she doesn't want to move until the children are back.

At one point C.S. was living with Mrs. S.'s sister and brother-in-law and she saw him twice, once when she went over to her sister's house, and once when her brother-in-law brought him over to the S.'s house.

Mr. S. usually works as a truck driver, but is presently a film developer. Mrs. S. baby sits, and has applied to Missouri State Employment Office for a job.

Miss Douglass was recalled to testify that C.S. lived with his aunt and uncle from October of 1968 until February of 1970. Thus, according to Miss Douglass, Mrs. S. would not have seen C.S. during the statutory period, but during the previous year. After trial, the court ordered the parents' rights terminated.

"The action for termination of parental rights is designed to extinguish forever the pre-existing legal rights of the parents with respect to their child and is the subject of specialized legislation. The power of the juvenile court to effectuate such a result is in its entirety the creation of the statute; it does not otherwise exist. Therefore, the terms of the statute [Sec. 211.441] must be strictly applied." In Re Taylor, Mo.App., 419 S.W.2d 473, 475[1, 2]; In re C——, Mo.App., 468 S.W.2d 689, 691.

The pertinent statute [Section 211.441] [1] provides in part:

" * * * The juvenile court may, upon petition filed as provided in other cases of children coming under the jurisdiction of the court, terminate all rights of parents to a child when it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:

* * * * * *

(2) When it appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the petition

(a) The parents have abandoned the child;

(b) The parents have willfully, substantially and continuously or repeatedly neglected the child and refused to give the child necessary care and protection;

(c) The parents, being financially able, have willfully neglected to provide the child with the necessary subsistence, education or other care necessary for his health, morals or welfare or have neglected to pay for such subsistence, education or other care when legal custody of the child is lodged with others;

(d) The parents are unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs or repeated lewd and lascivious behavior, which conduct is found by the court to be seriously detrimental to the health, morals, or well-being of the child; * * *."

■ It is our duty in the review of this non-jury case to make our own independent findings of fact and conclusions of law. Rule 73.01(d), V.A.M.R.; S.K.L. v. Smith, Mo.App., 480 S.W.2d 119[1].

■ Appellant urges that there was no "clear, cogent and convincing evidence" of abandonment and willful neglect of this child by his parents. We agree. The picture presented by the mother's testimony in the court below is one of utter confusion. The fact that her rights to two of her other children were terminated and still she requested visits with them only serves to strengthen the impression we have that this woman did not understand what was happening nor what she was expected to do.

The problem before us is not unique. It seems to arise frequently where children are taken from their natural parents and placed into foster homes, under change of custody orders of the Juvenile Court. The reasons for such custody changes vary but the net effect is to place the parent in the position of having to maintain contact with the child through third persons—the

1. All references to statutes and rules are to RSMo 1969, V.A.M.S. and V.A.M.R.

agency personnel. It is not at all clear that many of these parents understand they still have the right to see their children, or what efforts they must make to do so, or whom they must contact. It is certainly not clear that they understand that their failure to attempt to see their children may result in termination proceedings being brought.

As to the actual hearing to terminate parental rights, it is clear that the burden of proof rests entirely on those seeking to effectuate the termination. Because the termination proceedings are bottomed on willful neglect and abandonment, we believe it incumbent on the agency or a juvenile officer to clearly establish that the natural parents were fully aware of their right to visit their children and of their obligation to furnish support and other incidentals which demonstrate their interest in the children. While a child is in a foster home, the duty of the parents to support the child seems to be especially difficult for the parents to understand. This is entirely natural. The parents know that the children are being cared for, and that they are not being physically neglected.

Based on this type of factual case, we believe that the agency or juvenile officer should inform the parents of their obligation to support their child who is in foster care and to inform them of what the parents must do to meet this obligation. The agency or a juvenile officer should also show that the parents were made aware of the procedures to be followed and the persons to be contacted in order to maintain a relationship with their child. The parents should be fully advised that failure to exercise their parental responsibilities and maintain contact with the children may result in the termination of their parental rights.

It is quite clear from the record that no abandonment and no willful neglect was shown during the period March 30, 1970, to March 31, 1971. "Abandonment" implies a willful, positive act such as deserting the child. In re Slaughter, Mo. App., 290 S.W.2d 408. "Neglect" is the intentional, deliberate and unjustifiable failure to perform the duty with which the parent is charged by law according to acceptable community standards. S.K.L. v. Smith, supra.

The mother from her testimony appears to be undereducated and totally confused over the series of events which has deprived her of her children. The fact that she requested a visit with all her children the day after her rights to two of them had been terminated further illustrates this woman's lack of understanding of what was happening. Rather than willfully neglecting them, she appears not to have known what procedure to follow in order to see them. She also testified that she was often told she could not see them, and that she did not know where they were. Resultant anger and frustration held her back from further requests. From the record, we do not find either abandonment or willful neglect. In re Taylor, supra.

Lest we be accused of failing to take into consideration the best interests of the child, let us hasten to add that we full well realize the burdens under which the Juvenile Court and its personnel labor, and the honest efforts they make on behalf of the underprivileged families with whom they deal. We also realize that many of these children would have a much better chance at life were they placed in adoptive homes. But we do not have the authority to decide the children's welfare to such an extent, nor do we want it. The statute lists grave reasons for terminating parental rights. If one of these reasons is not proved to exist, the court may not act to terminate. Renfro v. Jackson County Juvenile Court, Mo.App., 369 S.W.2d 616[2]. We see no evidence in this case that any of the statutory reasons do exist. The burden of proof was not carried. Accordingly, the judgment is reversed.

SMITH and SIMEONE, JJ., concur.