**In re Interest of A.L.B. and S.W.B.**

**Nos. 52733, 52735.**

Missouri Court of Appeals,
Eastern District,
Northern Division.

Dec. 29, 1987.

Motion for Rehearing and/or Transfer Denied Feb. 4, 1988.

Edward M. Berg, Columbia, for appellant.

Carla Wood Tanzey, Lewis Eugene Melahn, Mexico, for appellee.

SIMEONE, Senior Judge.

## I.

This case involves the interpretation of the 1985 amendments to the termination of parental rights statute, § 211.447, R.S.Mo., 1986. It involves the reciprocal duties and responsibilities of the Division of Family Services and the natural parent concerning the reunification of the parent with his children in foster care; whether the sexual abuse of a sibling is sufficient to terminate the parental rights of the natural parent to his own children; and whether there is clear, cogent and convincing evidence of neglect by the parent, sufficient to terminate his parental rights.

These cases are consolidated appeals by the natural father, R.L.B., from judgments entered on December 15, 1986 terminating the father's parental rights of his two children, S.W.B. and A.L.B., pursuant to § 211.447, R.S.Mo., 1986. He alleges several grounds of error. We affirm.

R.L.B. is the natural father of a boy, S.W.B., born April 5, 1982 and A.L.B., a girl, born on February 29, 1980. The father and the natural mother, C.A.B., were married in September, 1979. C.A.B., at the age of fourteen, became pregnant by an unknown father and gave birth to a daughter, A.D.D. in May, 1978. R.L.B. and C.A.B. lived with A.D.D. and their two children who are the subjects of these proceedings in Mexico, Missouri until approximately 1983. In January, 1984, C.A.B. and the three children moved in with her paramour, R.H., and resided in a trailer park in Mexico, Missouri. In April, 1984, a hotline referral was received regarding the treatment of the three children. R.H. was seen striking A.L.B. and A.D.D. Thereupon, the Juvenile Court issued a custody detention order, and as a result, all three children were made wards of the court, were placed in foster care and have remained in foster care ever since. In August, 1984, appellant moved to Windsor, Missouri in Henry County to live with his sister and to seek employment there. In December, 1984 or January, 1985, another hotline call was received alleging that appellant had sexually abused A.D.D., his stepchild, sometime while the family was still living together. In December, 1985, C.A.B. voluntarily terminated her parental rights to all three children. In October, 1986, the court terminated the mother's parental rights. As a result, the efforts on the part of the Division regarding reunification shifted to the father-appellant, R.L.B.

Appellant had sporadic employment and earned very little money in 1985 and 1986. In 1985 he earned $287.50 from one company, $189.13 from another and $112.56 from still another. He has never been employed full time. He has a limited education and poor educational skills. In 1986, he worked for only two months at $3.50 an hour receiving $160.36. However, he did own a truck, but no child support was ever made by the appellant. Ms. Karen Hillman, a caseworker, discussed appellant's obligation to support and visit the children and suggested that he pay a "couple dollars a week or whatever for child support." Ms. Hillman worked with appellant while he was in Audrain County, but when he moved to Windsor, his new caseworker became Mr. Darrell Hukriede.

In June, 1985, a "Court Approved Written Service Agreement" was presented to and discussed with appellant. The Agreement stated that appellant expressed an interest in "regaining custody of [his] children" and "in order to work toward that

goal," he would agree to perform certain acts of communication and support. The amount of monthly child support was left blank in the "Agreement." The Agreement was forwarded to Henry County to Mr. Hukriede but on June 11, 1985, appellant refused to sign it on the advice of his attorney.

Since June, 1985, appellant has visited the children five times. These visits were set up by the caseworker. He visited the children on June 26, August 8 and 10, 1985, and March 8 and April 8, 1986. In May, 1986, although he was in Mexico, he declined to visit the children and in December, 1985, while in Mexico, he was asked if he wanted to visit the children, but he stated that "no, he had to get back to wherever he was going." He has not visited the children since April, 1986. The caseworker testified that "in the beginning, he made quite a few efforts. After the sexual abuse hotline [which charged him with sexual abuse of A.D.D], I'd say his efforts were minimal." During these visits appellant was "more [of] a playmate, wrestling with the kids, playing with them. He really didn't show any interest in their school or how they were doing or adjusting." The social workers attempted to interest appellant to attend "parenting classes" and offered him "gas" money to go from Windsor to Mexico on several occasions.

After the hotline call concerning A.D.D. appellant took a polygraph examination which appellant's attorney and the Juvenile Office agreed to. After that examination, the detective making the examination discussed the alleged sexual abuse matter with appellant. R.L.B. "stated that he had taken a bath with [A.D.D.] He stated that, her being curious, she did play with his penis." The detective testified that on another occasion, appellant "stated that he had laid on the bed with [A.D.D.] without any clothes on, and he said that she had been curious at that point." As a result of these encounters, appellant was "stimulated." In chambers, A.D.D. testified that appellant took her into his bedroom and told her to "get on top of him," and he "got on top of her" and asked her to touch him "in his privates." Appellant also "touched" her with his hand, but did not hurt her. Appellant denied lying on the bed, and as to the bath incident, exercised his Fifth Amendment rights.

From the Spring, 1984 through the early part of 1986 the caseworkers spoke to appellant about termination of parental rights and the failure to exercise his parental duties regarding communication and support. After the alleged sexual abuse incident, Ms. Hillman suggested that appellant needed counseling, but "he didn't see any reason to go." She testified that within a month after the children were placed in custody, in 1984, she informed appellant "what needed to be done to get the children out of foster care," and later informed him of the results of failing to communicate with or support the children.

While living in Windsor, Mr. Hukriede visited appellant in his home and in the county office. Hukriede did "things that we thought should be necessary in order to try and regain custody of his children." In June, 1985, the Written Service Agreement, "parenting classes," and attendance at Community Counseling Consultants were discussed. In June, appellant did attend counseling. Again in July, Hukriede contacted appellant and discussed the Service Agreement and the consequences of failing to sign it, but appellant again refused. Later in the year appellant desired to attend community counseling and requested "gas money" which was provided. He attended community counseling in December, 1985 and January, 1986. In January, appellant was informed that the Division could no longer provide gas money for counseling sessions. During the Spring and Summer several attempts were made to contact appellant to no avail, and eventually it was determined that appellant was living with a woman at another address. When contacted in September, 1986, the agreement was again discussed, but appellant refused to sign it.

All in all, appellant attended one parenting session, although available on a weekly basis, and two or three counseling sessions.

Mr. Hukriede testified that the efforts at reunification were unsuccessful. A "fair assessment" of the situation, he said is that the appellant "basically sat around and waited for [the caseworker] to do something for him and did essentially nothing for himself."

During the termination hearing the appellant testified that he did not make regular visits to Mexico to visit his children because of the "lack of funds and a lack of transportation." At the hearing much was made of the alleged failure of the Division to strictly follow the guidelines and procedures adopted in the "Alternative Care Procedures Handbook." The Handbook adopted by the Division provides that the case manager is to "assist in every way possible, and within 90 days preferably, a child's achieving a permanent home and family" by "structured, time-limited rehabilitation programs for parents to help reunite families" to use various techniques to reunify the children with parents such as planned, regular visiting and a case management method. Appellant's evidence sought to show that there was not a structured case plan, nor were there planned monitored visits, permanency planning review meetings, and that available federal funds were not given to attend counseling and parenting classes.

Appellant testified that when he visited his children he would give them a "little bit of money," but that he was not capable of contributing to his children. He felt that Family Services was not trying to "help get his children back" and "never gave me any money to come down there or nothing." He explained that he did not sign the Service Agreement because "I didn't feel that I could keep the agreement because I was being laid off in between jobs so much and I couldn't afford to make it down that much." He did not attend the counseling and parenting classes because he "didn't have money to make them all the time."

Although he went to two or three classes and a counseling session, the "lady told me that there was no reason for me to be there; so I quit going again." He claimed he was never told of the consequences of not communicating with or supporting his children. He desired to have his children back and he testified that he now has a sufficient "home environment that the children could be returned."

Finally on July 31, 1986, petitions for termination were filed by the Juvenile Officer of Audrain County seeking to terminate the parental rights to A.L.B. and S.W.B. Amended petitions were later filed seeking to terminate appellant's parental rights for various reasons.

On December 5, 1986, a hearing was held on the petitions at which the above facts were adduced. Following the hearing the court found that the allegations of the petition were true and entered an order terminating appellant's parental rights in the best interests of the children.

The order found that appellant (1) "has repeatedly and continuously failed, although physically and financially able," to provide food, clothing, shelter and education for the children; (2) on various occasions "deliberately, sexually abused" the children's sister, A.D.D.; (3) that there is little likelihood "that potentially harmful conditions will be remedied at an early date so that the children may be returned to the father and the continuation of the parent-child relationship greatly diminishes the children's prospects for early integration into a stable and permanent home"; (4) refused and failed to sign a social service plan, to comply with a social service plan, to attend monthly visitations, and since the filing of the petitions has not contributed to the children's support; (5) that he has attended approximately only three counseling and parenting sessions, despite being provided with gas money for transportation and the efforts of the Division; (6) has failed to make payment for the cost of care and maintenance when "financially able to do so"; (7) on "numerous occasions" sexu-

ally abused A.D.D. knowing that such abuse would subject the children to a "substantial risk of physical and mental harm"; (8) has had no contact with the children or with the Juvenile Court since May, [sic] 1986; and, (9) has paid no child support since the children were made wards of the court, even though sporadically employed during that time.

## II.

On appeal appellant broadly contends that the trial court erred in terminating his parental rights for the reasons that (1) the state did not meet its burden of proof with clear, cogent and convincing evidence; (2) there was no substantial evidence to support the termination; and, (3) that the state had an affirmative duty to provide him with reunification information and services and had not done so. He refines these contentions in various subpoints to be discussed, *infra.* The real thrust of the appellant's position, as we perceive it, is that it is the duty of and incumbent upon the Division of Family Services to establish a structured case-reunification plan with certain time frames, and to establish a plan to reunite him with his children and to offer him services, finances, telephones, and counseling which would address reunification. "If these were properly offered," he contends, "then the responsibility would fall on appellant to carry out these structured programs and services." But these "opportunities were not offered." Therefore, "it is unfair for the state to try to use these omissions on the part of [appellant] to justify termination when it failed in its duty to provide him with the opportunities."

## III.

This is a court-tried proceeding. As a reviewing court, we defer to the trial court's conclusions where there is substantial evidence to support these findings, but must examine whether the trial court applied the correct standard of proof and our duty is to sustain the order unless there is no substantial evidence to support it, or unless it is contrary to the weight of the evidence or unless it erroneously declares or applies the law. *D.G.N. v. S.M.,* 691 S.W.2d 909, 912 (Mo. banc 1985); *In Interest of H.J.P.,* 669 S.W.2d 264, 270 (Mo.App. 1984); *In Interest of S.D.W.,* 702 S.W.2d 527, 529 (Mo.App.1985); *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). Pursuant to the provisions of § 211.447, the trial court must decide that the evidence clearly, cogently and convincingly demonstrates the existence of at least one of the conditions forming the basis of the termination petition, and determine whether termination would be in the best interests of the children. The state's burden of showing by clear, cogent and convincing evidence is met when the evidence "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Adoption of W.B.L.,* 681 S.W.2d 452, 454 (Mo. banc 1984) citing *In re O'Brien,* 600 S.W.2d 695, 697 (Mo.App. 1980); *cf., In Interest of S.D.W., supra,* 702 S.W.2d at 529.

Subsection 2 of § 211.447, as amended in 1985 provides that the juvenile court may terminate the rights of a parent to a child upon a petition filed by the juvenile officer, if it finds that the termination is in the best interests of the child and when it appears by clear, cogent and convincing evidence that one or more of the following grounds for termination exist:

(2) The child has been adjudicated to have been abused or neglected. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following conditions or acts of the parent:

\* \* \* \* \* \*

(c) A severe act or recurrent acts of physical, emotional or sexual abuse toward the child or any child in the family by the parent, including an act of incest, or by another under circumstances that

indicate that the parent knew or should have known that such acts were being committed toward the child or any child in the family; or

(d) Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for his physical, mental, or emotional health and development;

(3) The child has been under the jurisdiction of the juvenile court for a period of one year, and the court finds that the conditions which led to the assumption of jurisdiction still persist, or conditions of a potentially harmful nature continue to exist, that there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future, or the continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home. In determining whether to terminate parental rights under this subdivision, the court shall consider and make findings on the following:

(a) the terms of a social service plan entered into by the parent and the division and the extent to which the parties have made progress in complying with those terms;

(b) The success or failure of the efforts of the juvenile officer, the division or other agency to aid the parent on a continuing basis in adjusting his circumstances or conduct to provide a proper home for the child;

\* \* \* \* \* \*

3. When considering whether to terminate the parent-child relationship ..., the court shall evaluate and make findings on the following factors, when appropriate and applicable to the case:

(1) The emotional ties to the birth parent;

(2) The extent to which the parent has maintained regular visitation or other contact with the child;

(3) The extent of payment by the parent for the cost of care and maintenance of the child when financially able to do so including the time that the child is in the custody of the division or other child-placing agency;

(4) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time;

(5) The parent's disinterest in or lack of commitment to the child; ....

\* \* \* \* \* \*

## IV.

Under all the circumstances, we conclude that the trial court's order, under the evidence and statutory guideposts, is to be affirmed. Considering all the evidence there were sufficient grounds, based on clear, cogent and convincing evidence, to terminate the parental rights of appellant.

We consider appellant's specific contentions *seriatim.* Refining his broad-based contention, appellant argues that the state failed in its duties concerning reunification and in its duty to comply with the Alternative Care Handbook to achieve reunification which limited his progress to achieve that reunification. The efforts made by the Division to aid him regain his children were "inadequate" and not in compliance with the Handbook. He urges that the court erred in finding that he failed to comply with the social services plan, in finding that the Division had attempted to aid him to provide a proper home environment and that the "conditions" would not be remedied. Instead he asserts that there was no evidence that any harmful conditions still existed and that the procedures outlined in the Handbook and as outlined by the federal court in *G.L. By & Through Shull v. Zumwalt*, 564 F.Supp. 1030 (W.D. Mo.1983) were not adhered to. At the hearing appellant introduced the Alterna-

tive Care Procedures Handbook and used it to cite instances of how the Division failed to give him assistance that would have allowed him to earn his children's custody.

We find these contentions, in light of the evidence, unpersuasive.

■ While the Division is under a duty to establish a reunification plan, and although § 211.447.2(3)(a) provides that in determining whether to terminate parental rights, the court is to consider the "terms of a social service plan entered into" and the "efforts" of the Division to aid the parent in adjusting his circumstances, the Division is not required to initiate visits or maintain contact between children and the parent. Visitation or contact which does not originate with a true desire of a parent amounts to only a "superficial and tenuous relationship." *In Interest of R.E.M.*, 712 S.W.2d 398, 403 (Mo.App.1986). Although the statute requires the court to consider the terms of a social service plan, it also requires an affirmative duty on the part of a parent to support, communicate and visit the children and to show that the parent is committed to the child by showing an interest. The record here is replete with evidence that the Division encouraged visitation, communication, offers of help, and counseling to improve the family relationship and reunify the family before and after the hotline sexual abuse of A.D.D. But appellant, over a long period of time, did not show that commitment to the children essential to the parental relationship, but instead showed a disinterestedness. Mr. Hukriede summed it up when he stated that it was a fair assessment that the appellant "basically sat around and waited for the (Division) to do something for him and did essentially nothing for himself." Suffice it to say that there was substantial evidence concerning the establishment of a service plan and concerning the efforts of the Division to aid appellant regain custody. Hukriede offered assistance by way of recommending parental and other counseling services, provided gas money, and made several unsuccessful efforts to contact appellant.

■ Although not all of the specifics of the Handbook were followed to the letter, substantial efforts were made to aid appellant in his reunification with his children. Appellant was offered two written service agreements, but refused to sign them. He did not frequently communicate with or visit his children; and even when he was in the same city with them he did not have time to visit. The efforts of the Division were adequate, numerous and pervasive, but the appellant did not show that human commitment to his children compatible with his testimony that he desired to retain them.

Although the Division adopted an Alternative Care Procedures Handbook and substantially complied with it, and the law requires the trial court to consider the terms of a social service plan for reunification, the statute does not require any particular standard of treatment or services. Even the absence of treatment or services is no defense to a termination proceeding. *In Interest of D.R.W.*, 663 S.W.2d 426 (Mo.App.1983); *In Interest of B.M.P.*, 704 S.W.2d 237, 245 (Mo.App.1986).

We need not reach the ultimate question whether a failure to adopt a reunification program is sufficient to excuse a parent so as to be a defense to a termination proceeding because here there was substantial evidence of compliance with the Handbook, and appellant failed to show that commitment to his children, after knowledge of the consequences, to avoid termination.

The world of the parent-child relationship cannot be determined by precise mathematical formulae or precise adherence to every paragraph in a procedural handbook. The world of the parent-child relationship deals with the human factors of desire, affection, interest and commitment. These are the important factors and they come initially and inwardly from the parent. These human factors were not sufficiently adhered to here by the appellant.

Appellant relies on *C.S. v. Smith*, 483 S.W.2d 790 (Mo.App.1970). That decision is distinguishable. Here appellant was adequately informed of his obligations.

Appellant also relies on *G.L. By and Through Shull v. Zumwalt, supra.* That decision does not aid him. That decision was a consent decree covering the many aspects of children in foster care in the Kansas City area. As a part of the consent decree, the Division was required to "implement permanent plans for each child in its custody to ensure that no child stays in foster care longer than is necessary." *Id.* at 1038. To meet this requirement, the Division is to establish a system of "permanency planning." The system dealt with preliminary planning, visits, permanency plans and other matters. This federal decision does not control the issues in this case. *Zumwalt* dealt with the processes to be utilized by the Division in all sorts of matters, including permanency planning. The decision was a guide to protect children in foster care; it did not deal with termination under our law.

This point is denied.

## V.

▪ Appellant next attacks the trial court's order under § 211.447.2(2)(c) concerning the sexual abuse of A.D.D., the children's sibling. Appellant contends that the court erroneously applied the law because the two incidents with A.D.D. were not "severe" or "recurrent" acts of sexual abuse sufficient to terminate his parental rights. He argues that the court did not find that his actions were "severe," "grave" or "extraordinary." He admits that while these actions are not to be condoned they are not sufficient to justify termination.

In its order of termination the trial court found that the appellant "deliberately sexually abused said juvenile's sister, [A.D.D.], on various occasions by taking a bath with said child ... and by laying naked on a bed with the child and allowing her to fondle his penis ..." While this language of the court did not specifically track the statute or use the word "severe" or "recurrent," there was sufficient evidence of "recurrent acts." "Recurrent" means to "take place

again." The court also found that the abuse of A.D.D. subjected the children here, her siblings, to "substantial risk of physical and mental harm."

The trial court correctly so found. The courts of this state have not been hesitant to terminate parental rights of a child when a sibling has been abused. *D.G.N. v. S.M.*, 691 S.W.2d 909, 912 (Mo. banc 1985) quoting *In Interest of J.A.J.*, 652 S.W.2d 745, 749 (Mo.App.1983) ("To require a child to suffer the fate of his siblings prior to termination of parental rights would be a tragic misapplication of the law"); *In Interest of B.M.P.*, 704 S.W.2d 237, 244 (Mo. App.1986); *In Interest of S.D.W.*, 702 S.W. 2d 527, 530 (Mo.App.1985) (physical abuse); *In re A.A.*, 533 S.W.2d 681 (Mo.App.1976); *In Interest of A.K.S.*, 602 S.W.2d 848, 851 (Mo.App.1980); see *L. v. Jackson County Juvenile Court*, 544 S.W.2d 330, 332 (Mo. App.1976); Mo. Bar CLE, *Juvenile Law*, § 8.21 at 8–17 (1985). The testimony of A.D.D. concerning her sexual abuse was competent. See *State v. Williams*, 729 S.W.2d 197 (Mo. banc 1987).

We have examined the authorities relied upon by the appellant and find them either to be distinguishable or not controlling. *D.G.K. v. H.H.*, 719 S.W.2d 510 (Mo.App. 1986) (no evidence of injury; ordinary disciplinary measures); *In Interest of J.A.J.*, 652 S.W.2d 745 (Mo.App.1983) (abuse of one child sufficient to terminate parental rights in another child); *In Re M.J.M.*, 483 S.W.2d 795 (Mo.App.1972) (mere coldness only toward child does not constitute neglect). Sexual abuse of a sibling is sufficient to terminate parental rights to his own children.

## VI.

▪ Appellant next contends the court erred in finding that he had the financial means to provide care and support for his children because the evidence showed that he was financially distressed and could not contribute to their support. The court found that he failed to make any payments for the cost of care and maintenance when he was "financially able to do so."

Section 211.447.2(2)(d) provides that in determining whether to terminate, the court is to consider the "repeated or continuous failure by the parent, although physically *or* financially able, to provide the child with adequate food, clothing, shelter, or education ... or other care and control necessary" for the child's "physical, mental, or emotional health and development."

It is true that during the years 1985 and 1986, appellant had very limited income, and had a limited education and limited skills and had worked as a dishwasher, dock hand and poured concrete. For some time he lived with his girlfriend and her children and received foodstamps. He owned a truck. The father is a physically healthy, 28 year old, male at the time of the hearing. He was informed by the caseworker that he would only have to contribute a "couple dollars a week." But during the whole period from 1984 to the hearing in December, 1986, no effort of support to provide any food, clothing or shelter was made. The appellant never made any support contribution even when he was employed except for occasional small gifts to the children.

The terms of the statute—"adequate" and "financially able"—are flexible. The General Assembly designed this flexibility to cover the spectrum of factual situations and parental finances. See *In Interest of M.B.A.*, 709 S.W.2d 941, 947 (Mo.App.1986). The statute also states that the parent is to be physically *or* financially able to provide for the child in the disjunctive. Here the appellant's lack of support and disinterestedness demonstrated a lack of conviction to aid his children. This lack of conviction was compounded by his failure to communicate with his children. Even when appellant had the opportunity to visit his children when he was in Mexico, he did not have time because he "had to get back to wherever he was going." We cannot express a firm belief that the trial court's finding on this issue was erroneous or against the weight of the evidence. *In Interest of A.M.K.*, 723 S.W.2d 50, 52 (Mo. App.1986).

Appellant also contends that the court erred in finding that the "conditions" could not be remedied. The court found in its order that the "conditions" continued to exist and that there is little likelihood that they will be remedied at an early date so that the children can be returned to the appellant. The court found that the appellant failed to comply with a social service plan and his efforts did not comply with the proposed plan; it found that the Division made efforts to aid appellant. There was substantial evidence here for the court to find that the conditions continued to exist. See *In Interest of R.H.S.*, 737 S.W.2d 227, 234 (Mo.App.1987).

## VII.

In his final point, appellant paints with a broad brush to urge that the court erred in several findings: appellant was disinterested; the actions concerning sexual abuse of A.D.D. caused substantial risk to the children here; he had the financial ability to support, and the Division actually prevented his visitation. These contentions which reiterate many of his other contentions are without merit. There was substantial clear, cogent and convincing evidence to support the court's finding on these matters. They have been addressed earlier in this opinion.

## VIII.

We have read the entire record. The order of termination was supported by substantial evidence based on clear, cogent and convincing evidence, and termination was in the best interests of the children, S.W.B. and A.L.B.

The judgment is therefore affirmed.

SATZ, C.J., and DOWD, J., concur.