In the Interest of H. G. R., Jr., a child:
J. C. R., Mother of H. G. R., Jr.,
Appellant,

v.

Ralph L. SMITH, Juvenile Officer,
St. Louis County, Respondent.

No. 34315.

Missouri Court of Appeals,
St. Louis District,
Division Two.

July 25, 1972.

Harold E. Scheppner, Jr., David A. Lander, Legal Aid Society, Clayton, for appellant.

Corinne Goodman, Miriam Bricker, Legal Advisor, Clayton, for respondent.

DOWD, Presiding Judge.

This is a statutory action under Sections 211.441 to 211.511 [1] to terminate parental rights based on a petition brought by the Juvenile Officer of the St. Louis County Circuit Court. From a judgment terminating such rights, the natural mother appeals.

On December 22, 1970, the Juvenile Officer of the St. Louis County Juvenile Court filed a petition to terminate the rights of the parents to H. G. R., Jr. on the grounds that the said parents, " * * since on or about December 15, 1969 have abandoned the child and have wilfully, substantially and continuously or repeatedly neglected the child and refused to give the child necessary care and protection." Summons was duly served on the mother and

1. All references to statutes and rules are to RSMo.1969, V.A.M.S. and V.A.M.R.

publication of notice was given to the father.

Trial was heard on March 16, 1971, March 30, 1971, and June 2, 1971. Trial was continued from March 16 to March 30, 1970, to enable the child's mother, Mrs. J. C. R., to obtain legal counsel. The evidence of the Juvenile Officer on March 30, 1971, consisted of the testimony of Miss Penny Prill, a social worker with Family Services. Miss Prill testified that she was the only case worker assigned to the case. She stated that during the period December 22, 1969, to December 22, 1970, there was no contact between the mother and the child. The mother did not call, write or request visitation, and she contributed nothing to the child's support. The same was true of the father. She also stated that if the mother had called her, she (Miss Prill) would have a record of the message.

Appellant mother's evidence consisted of the testimony of herself, and the man with whom she lives, Mr. L. G. S. Mrs. R., who has a fourth grade education, testified that she had not seen her child during the period December 22, 1969 to December 22, 1970, but had made unsuccessful efforts to do so. She called Miss Prill several times, and actually spoke to her twice: "I called Penny Prill, asked her about seeing my child, and sometimes I got in touch with her and she told me I couldn't have visitation rights until The Court decides on it. * * *" When asked whether she had offered to give any clothing or money for the support of the child, Mrs. R. replied, "No. I didn't know I had to do it that way." She testified that she has been living with L. G. S. for about two years, but he supports her and would be willing to support her child. She does not know the whereabouts of the child's father.

Under questioning by the Court, Mrs. R. testified that H. G. R., Jr. was taken away while he was in the hospital in 1967, when he was about 18 months old. She stated that she had spoken to Miss Arnold, a Juvenile Court Officer, the day after she received the Summons. Miss Arnold told her to get an attorney. On the times when she had called Miss Prill and the latter was not in her office, she had left her name. The calls could not be returned because she had no telephone. Her calls to Family Services were all made from neighborhood phone booths. Mrs. R. has two other children, both girls, who were also placed in foster care. Miss Prill is also their caseworker, and when Mrs. R. spoke to her, she inquired about all three children.

Mr. L. G. S. testified that he lives with and supports Mrs. R., and would be willing to support her child. His net income is $113.98 per week. He would like to marry Mrs. R., if she could find her husband and secure a divorce.

The court called as its witness Miss Kathryn Arnold. She testified that the child was taken away in January of 1967, and that she had not heard from Mrs. R. until January of 1971. She related an incident on July 20, 1970, where Mrs. R. stabbed Mr. S. She was arrested and he was hospitalized. Recalled to the stand, Mr. L. G. S. testified, "We was wrestling and I accidently got cut." It was the first and last time something like that ever happened.

On June 2, 1971, Miss Arnold was recalled to the stand. The following questions and answers appear on the record:

"Q Speaking of the period between December 22, 1969, and December 22, 1970, would you have had any contact with the member of the family about H. G. R., Jr.?

"A Yes, I did.

"Q When would that contact have been?

"A That was October 5, 1970.

"Q What was the nature of the contact?

"A Mrs. R. called me to tell me where she was living and gave me her address and to tell me that she would like to have her children back and that included H. G. R."

Miss Prill was also recalled. She testified that Mrs. R. didn't contact her until December 29, 1970. Miss Prill told her the petition for termination had been filed, but did not advise her to get a lawyer. Miss Prill was cross-examined as follows:

"Q * * * December 22, 1969, to December 22, 1970, had you had any contact at all with the mother?

"A No.

"Q Was the case in your workload?

"A Yes.

"Q Had you made any attempt to find the mother?

"A No.

"Q Why didn't you make an attempt to find the mother?

"A Well, because she really hadn't shown any interest in the child prior to that time and it was the plan to proceed with termination.

"Q From December 22, 1969, to December 22, 1970, you knew that they were planning to proceed with termination, is that it?

"A Yes.

"Q And that is why you didn't contact the mother?

"A Yes."

Miss Prill related that Mrs. R. had been very angry and hostile when her two daughters were taken from her a year after H. G. R., Jr., that her attitude toward the Agency and toward Miss Prill was one of enmity. She testified to the general procedure of handling phone calls at the Agency, that a supervisor is always there to take the calls, and that the calls are always returned. She received no message that Mrs. R. ever called.

On June 2, 1971, the Court entered its order terminating the parental rights of both parents for the reason " * * * that it appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the Petition [December 22, 1970] herein that said adult natural mother and said adult natural father have abandoned said child and have willfully, substantially and continuously neglected said child and have refused to give the child necessary care and protection." The Court further ordered the custody of the child transferred to Family Services " * * * for foster care and placement in the best available adoptive home, * * *."

The statute under which the rights of a parent to a child may be terminated is Section 211.441. The part of the statute pertinent to this case provides:

" * * * The juvenile court may, upon petition filed as provided in other cases of children coming under the jurisdiction of the court, terminate all rights of parents to a child when it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist:

* * * * * *

"(2) When it appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the petition

(a) The parents have abandoned the child;

(b) The parents have willfully, substantially and continuously or repeatedly neglected the child and refused to give the child necessary care and protection; * * *."

It was recently pointed out by this court In the Interest of D———J———— A———— v. Smith, Mo.App., 477 S.W.2d 718, 720 that proceedings under Section 211.441 are of the utmost gravity. " * * * They contemplate a complete and final severance of all legal rights, privileges, duties and obligations between parent and child, with the prospective replacement of the natural by an adoptive parent or perhaps a guardian. This power given the ju-

venile court is purely statutory. Without such legislation, the power would not exist. Accordingly, the terms of the statute must be strictly applied. In Re C———, Mo.App., 468 S.W.2d 689, 691 [1]; In re Taylor, Mo.App., 419 S.W.2d 473, 475 [1, 2]. As directed by Section 211.501, it is only after the court finds one of the conditions listed in Section 211.441 exists, and then only when supported by clear, cogent and convincing evidence, that it may proceed to terminate parental rights. As to this, whoever seeks to invoke the statute must carry the full burden of proof. Renfro v. Jackson County Juvenile Court, Mo.App., 369 S.W.2d 616, 621 [4]."

■ In the review of this non-jury case it is our duty to make our own independent findings of fact and conclusions of law. Rule 73.01(d); S. K. L. v. Smith, Mo.App., 480 S.W.2d 119 [1].

■ Appellant mother contends here that the trial court's finding was unsupported by the evidence and clearly erroneous in finding by " * * * clear, cogent, and convincing evidence that for one year or more immediately prior to the filing of the Petition herein that said adult natural mother and said adult natural father have abandoned said child and have willfully, substantially and continuously neglected said child and have refused to give the child necessary care and protection." We agree.

"Abandonment" has been defined as a willful, positive act such as deserting the child. In re Slaughter, Mo.App., 290 S.W.2d 408. Rather than abandonment [Section 1(2) (a) of § 211.441] of the child, H. G. R., Jr., was taken from his mother while the child was in a hospital due to a set of circumstances not contained in the record before us. The record does not support a finding that the mother abandoned the child.

"Willful neglect" was defined by this Court recently in S. K. L. v. Smith, supra, l. c. 124 of 480 S.W.2d as " * * * simply

the failure to perform the duty with which the parent is charged by law according to acceptable community standards. The neglect, in order to be wilful must be intentional, deliberate and without just cause or excuse. * * * Wilful neglect must exclude acts which occur because of events which are beyond the control of the parent and which are not his fault." Citing In Re C———, Mo.App., 468 S.W.2d 689, 693.

With this definition of "willful neglect" before us, we do not believe that the evidence is "clear, cogent and convincing" that appellant mother "willfully neglected" this child for the statutory year. The record to the contrary shows the appellant mother to be confused and uneducated.[2] While appellant acknowledged that she did not see her son during the statutory period she did testify that she made numerous telephone calls in order to see her son. She testified that she twice talked to Miss Prill on the telephone and asked to see her son but was told "I couldn't have visitation rights until the court decides on it."

To the contrary, Miss Prill testified that the mother did not contact her until December 29, 1970, when she told the mother that the terminations had been filed. However, Miss Prill stated that she did not contact the mother during the statutory year because "they were planning to proceed with termination." According to the record, appellant did evidence an interest in her son in her numerous attempts to visit her child. The mother's interest in the child is also borne out by the testimony of Miss Arnold, who stated that the mother called her on October 5, 1970, which was within the statutory year and asked for the return of her son H. G. R., Jr. Rather than "Willful neglect" [Section 1(2) (b)] we find ignorance on the part of the natural mother regarding her rights and duties to her son while he was in foster care.

Therefore, we find the termination of parental rights was erroneous. The evidence required by Section 211.441 is clearly

2. Her education was to the fourth grade.

lacking. Without such evidence strictly complying with one or more provisions of this statute, the Court may not terminate the rights of this parent.

The judgment is reversed.

SMITH and SIMEONE, JJ., concur.