**In re Trapp Children, Robert Emery TRAPP, DOB 1–9–68, et al.**

**Appeal of Robert Emery TRAPP and Linda Mae Trapp, natural father and mother.**

**No. KCD 27374.**

Missouri Court of Appeals, Kansas City District.

Sept. 2, 1975.

Motion for Rehearing and/or Transfer Denied Oct. 6, 1975.

Emery and Linda Mae Trapp had abandoned the children for more than one whole year; that they had willfully substantially and continuously from and since December 22, 1972, refused to support said children or to render them necessary care and protection or demonstrate to the court their willingness or ability to do so; and on February 27, 1973, the Henry County Juvenile Court found that said children were deprived of proper support while in foster care due to the falsification of information on the part of the parents and the court ordered that the parents, "who are gainfully employed," be made responsible for the financial support of said children in the amount of $198.00 per month or $66.00 per child, but have failed and refused to provide said support.

Hearing on the petition was accorded April 29, 1974. The evidence showed the following pertinent history and chronology preliminary to the year concerned by the petition to terminate:

*August 10, 1972.* Mrs. Trapp went to the Henry County Welfare Office where she talked with Mrs. Marilyn Whitaker, a caseworker, and requested information regarding public assistance. Mr. Trapp had been unemployed for some time other than occasional employment on Sundays at a filling station at $1.00 an hour. Mrs. Trapp was employed at Rival Manufacturing, but her doctor had advised that her fourth child was due at any time. Eligibility for Aid to Dependent Children and general relief was explained; and, since Mr. Trapp was employable, Mrs. Trapp was not eligible for either program and she was referred to a service worker, Mrs. Jones (Fritts). Mrs. Jones learned from Mrs. Trapp that "West Central" had been attempting to locate a job for Mr. Trapp, and that Mrs. Trapp would return to work after the baby was born.

*September 8, 1972.* Duane Edwin Trapp was born to Mr. and Mrs. Trapp at Golden Valley Hospital in Clinton, Missouri.

James L. Muller, Charles D. Wilson, The Legal Aid and Defender Society of Greater Kansas City, Kansas City, for appellants.

Morran D. Harris, Henry County Juvenile Officer, Clinton, for respondent.

Before SWOFFORD, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW J. HIGGINS, Special Judge.

Appeal from order and judgment terminating parental rights. §§ 211.441 to 211.511, RSMo 1969, V.A.M.S.

On January 3, 1974, the Juvenile Officer of the 27th Judicial Circuit filed a petition for termination of parental rights on grounds that the natural parents, Robert

*October 20, 1972.* Mrs. Trapp reapplied for Aid to Dependent Children, representing that Mr. Trapp left her a few days before the baby was born, that his whereabouts were unknown, and that he had obtained his check at Clinton Packing Company September 5, 1972. Her immediate need was for food and she was given commodities.

*October 27, 1972.* Mrs. Trapp's application for Aid to Dependent Children was approved at $158.00 per month. She subsequently received checks in that amount for November and December, 1972.

*November 2, 1972.* Mrs. Trapp went to the welfare office where she talked to Bill Edmonds, a caseworker. She was seeking food for her family and medical attention for the infant child, Duane, who was having trouble digesting his food. Mr. Edmonds procured a grocery order, followed her to her home in Montrose, and brought Mrs. Trapp and Duane to the hospital in Clinton. The child was seen by a doctor on the complaint of inability to retain food. The doctor prescribed medicine for dehydration, after which Mr. Edmonds returned Duane and his mother to the home. Mr. Edmonds noted the home as a 4-room house that had been condemned for construction of the Truman Reservoir, sometimes used as a hunting cabin. It was heated by a Coleman heater. The baby was in cardboard box bed on a divan, there was very little furniture, and there were several dogs present. The weather was beginning to turn cold; the three older children were dressed in shorts. Water supply was a nearby stream. The three older children were ostensibly in the charge of a man identified by Mrs. Trapp as an "uncle." Subsequent confrontation with Mr. Trapp revealed the true identity of the "uncle" as Mr. Trapp.

*December 15, 1972.* Mrs. Trapp presented the oldest child, Robert Emery, to the emergency department of the Clinton hospital. He had been ill for two weeks, but Mrs. Trapp had not been aware of any pneumonia until she took him to the hospital. She had been unable to go sooner due to impassable roads. Examination by Dr. James C. Coleberd, the Trapp's family physician, revealed a severely dehydrated child who was very lethargic. The admitting diagnosis was acute pneumonia, dehydration. The dismissal diagnosis was streptococcal pneumonia in both lung fields. He was otherwise normal, but his condition was critical, life threatening. Dr. Coleberd acknowledged that it is difficult for a lay person to distinguish dehydration as a sequela of pneumonia in its onset from less serious maladies, such as chest cold or benign fever. Dr. Coleberd saw the three younger children in December, 1972, and found them in normal health and good condition. Dr. Coleberd notified authorities of his feeling that Robert was a neglected child.

*December 19, 1972.* The juvenile officer filed a petition under Section 211.091, RSMO 1969, V.A.M.S., alleging that the parents legally responsible for the care and support of the Trapp children had neglected and refused to provide them proper support, education, medical, surgical and other care, that they were otherwise without care, custody or support, and that their behavior, environment, or association was injurious to their welfare, all as within the meaning of Section 211.031, RSMo 1969, V.A.M.S. The petition was served on Mrs. Trapp; service was not attempted on Mr. Trapp due to Mrs. Trapp's position that her husband's whereabouts were not known. Mr. Edmonds, upon knowledge of Dr. Coleberd's complaint, visited the Trapp home which was now in an isolated area east of Deepwater. Two men were present whom Mrs. Trapp identified as uncles. One of them was subsequently identified as Mr. Trapp. Mr. Edmonds went to the home to see if the children were in good health, and they were. They did not seem to be in any apparent danger. They were wearing underwear, but the house was warm. They were well fed and clean, and there was plenty of food. He recommended a further move closer to medical facilities, and the

family subsequently moved to quarters at the Central Hotel in Clinton.

*December 22, 1972.* The juvenile court placed temporary custody of the children with the Division of Welfare pending hearing on the neglect petition January 2, 1973.

*December (before Christmas), 1972.* Robert Emery Trapp, the oldest child, was taken by the Welfare Department to Joplin Diagnostic Center for special treatment of speech and similar problems. The mother was hostile at this move because she was not allowed to accompany her son.

*January 2, 1973.* Hearing was accorded on the neglect petition with Mrs. Trapp and an assigned attorney present. The court found the children to be neglected within the meaning of Section 211.031, *supra*, made them wards of the court, and vested their care, custody, and control in the Welfare Department, all until further order. Mrs. Trapp was advised at the hearing by Mr. Edmonds that the welfare people tried to rehabilitate individuals when children are removed from their homes in hopes of preparing them for the return, and that the court was asking the Welfare Department for such assistance. Mr. Edmonds helped her with money and otherwise to move to the hotel in Clinton, and she obtained a job at Wiley's Cafe. Mr. Trapp returned to Clinton after sustaining an injury and also was trying to secure employment.

Pursuant to the court's order of January 2, 1973, the Welfare Department placed Sheryl and Dee Ann in the Daniels foster home in Deepwater, and Duane in a Bates County foster home. Robert was at this time in the Joplin Diagnostic Center, and was eventually placed in a Bates County foster home.

Representations by Mrs. Trapp to welfare workers in the fall of 1972 that Mr. Trapp had abandoned his family, admitted in evidence in the juvenile officer's case, were untrue according to Mrs. Trapp's testimony at trial. They were made in order to qualify for Aid to Dependent Children which program then had, as a prerequisite to eligibility, absence of the father from the home.[1] Mr. Trapp visited Mrs. Trapp in the hospital when the baby was born in September, 1972. She visited him in Kansas City on at least two occasions, and she knew at all times how to reach him and that he would come to the aid of her and the children. Mr. Trapp visited the family when Robert went to the hospital December 19, 1972. The only estrangement was just prior to the baby's birth. Mr. Trapp's absence was in an effort to find work, and Mr. and Mrs. Trapp resumed living together January 27, 1973.

Mr. Trapp obtained a job driving a truck in Kansas City in September, 1972, but had to leave it a month or so later when he became sick.

Mr. and Mrs. Trapp both were unemployed at the time of the hearing on the neglect petition January 2, 1973, their Aid to Dependent Children payments were stopped due to the discovery that Mr. Trapp had not abandoned his family, and they still were unemployed when they resumed living together January 27, 1973. Sometime later Mrs. Trapp secured the restaurant job and Mr. Trapp was employed by Meyerco in Clinton in February, 1973.

On February 27, 1973, the juvenile court found that the Trapp children "were deprived of proper financial support while in foster care due to the falsification of information on the part of the natural parents of said children";[2] ordered the parents "who [were] gainfully employed, be made responsible for the financial support of said children in amount of $198.00 per month or $66.00 per child"; ordered the amount garnisheed from the parents' wages by the Henry County Circuit Clerk; and ordered

---

1. Section 208.041, Laws 1973, effective July 16, 1973, removed this requirement in certain circumstances.

2. It is not shown how this falsification deprived the children of any support while in foster care.

the parents to resume medical care of the children.

On March 16, 1973, Mr. and Mrs. Trapp filed a motion for rehearing in an effort to have custody of their children returned to them.

Also on March 16, 1973, execution was issued against Mr. and Mrs. Trapp under the order of February 27, 1973, and their employers were subjected to garnishment proceedings April 16, 1973.

On March 26, 1973, Mr. and Mrs. Trapp offered evidence on their motion seeking custody of their children. The motion was denied notwithstanding recommendation by caseworker Fritts that custody be restored to Mr. and Mrs. Trapp.

On April 23, 1973, Mrs. Trapp's employer deposited $80.36 on garnishment of her wages, and the court ordered it paid to Henry County in reimbursement of monies paid out on behalf of the Trapp children. Judgment was rendered against Mr. Trapp's employer upon its failure to respond to execution and, on May 23, 1973, $45.84 was paid into court. This sum was also ordered paid to Henry County in reimbursement of support monies paid for the Trapp children.

At the time of the garnishment, Mrs. Trapp was clearing less than $37.00 per week, and the $80.36 represented more than two weeks' wages. The $117.64 for which judgment was entered against Mr. Trapp's employer represented what he cleared every two weeks; however, only $45.84 was returned because that was all that was due him when his employment was terminated upon his arrest on April 16, 1973.

On April 14, 1973, Mr. and Mrs. Trapp were charged by information with stealing $86.00 from the Department of Welfare by fraudulent representations that Mr. Trapp was absent from the household when he actually was in the home in order to obtain Aid to Dependent Children. Mr. Trapp was arraigned April 16, 1973, and was committed to jail to await trial in lieu of $1,000 bond. Mrs. Trapp likewise was arraigned and committed April 27, 1973.

On May 18, 1973, the charge was amended to stealing under $50.00. Both Mr. and Mrs. Trapp pleaded guilty, were sentenced to a year in jail and placed on probation for two years conditioned upon good behavior and payment of costs within six months and payment of $474.00 to the Department of Welfare within one year. Upon their release, Mr. and Mrs. Trapp went to the welfare office, reported the terms of their probation, and renewed their request for return of their children.

Mr. Trapp worked for Royal Transports from June, 1973, to December, 1973, making $140 to $160 per week; and, in February, 1974, he went to work for Yellow Cab and, at the time of the hearing April 29, 1974, he was making $500 per month. On June 28, 1973, Mr. and Mrs. Trapp initiated an effort through the Jackson County Welfare Officer to obtain return of their children.

During the foregoing period Mr. Trapp deliberately avoided giving information about his employment to avoid garnishment and loss of "everything we had." He explained his failure to comply with the order of February 27, 1973, by his understanding that he and Mrs. Trapp were to re-establish a home after which their children would be returned to them. The caseworker indicated arrangements were proceeding satisfactorily; but when it came to restoration of the money, they were advised that the court required the money prior to return of the children. He made an offer on one final occasion while working for Meyerco to pay $50 on a balance of $69 "and to pay the balance next pay day." They were never able to meet living expenses and accumulated overdue obligations and still comply with the court's order. Mrs. Trapp earned less than $1,000 in 1973; together Mr. and Mrs. Trapp had an income of $7,300 in 1973.

Caseworker Edmonds acknowledged that Mrs. Trapp visited the girls in their foster home on a weekly or every-other-week basis. Mr. Edmonds did not know if she visit-

ed the baby in his foster home but, as a matter of policy, he did not tell her where the baby was for at least a month. He acknowledged that she made every effort to contact her children, and she missed one visit due to conflict with her employment. She saw Robert two or three times while he was in the Joplin Diagnostic Center, and in the welfare office upon his return to take him to Mercy Hospital in Kansas City for surgery. She later visited both boys in their foster placement. Mr. Trapp accompanied Mrs. Trapp on numerous visits.

Caseworker Joseph R. Brennan acknowledged that Mrs. Trapp had furnished some clothing as well as Christmas presents for the children.

Both Mrs. and Mrs. Trapp acknowledged their duty to support their children, expressed their love for their children, that they wished their return to them, that they never intended to abandon the children or forfeit their parental rights, that Mr. Trapp was working, and that they were ready, willing, and able to resume custody of their children.

At the time of trial, Henry County had paid a total of $2,726.24 for care of the Trapp children.

At the conclusion of the hearing, the court ordered, adjudged, and decreed that the parental rights of the father, Robert Emery Trapp, and the mother, Linda Mae Trapp, be terminated, and that their children, Robert Emery Trapp, Sheryl Ann Trapp, Dee Ann Trapp, and Duane Edwin Trapp, be in the care, custody, and control of the Henry County Welfare Department until further order, upon findings that: " * * * such termination is in the best interest and for the welfare of each and every one of these children, and further because the following facts and conditions are found to exist by the Court: It appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the petition that; first, Mr. and Mrs. Trapp have for all practical purposes abandoned these children; secondly,

Mr. and Mrs. Trapp have wilfully, substantially, continuously and repeatedly neglected the children and refused to give the children necessary care and protection; and lastly, that although Mr. and Mrs. Trapp were financially able during this period of time, they wilfully neglected to provide the children with necessary subsistence, education or other care when legal custody of the children was lodged with others; all as provided in Sections 211.441 through 211.511, Revised Statutes of Missouri."

As pertinent to this case, Section 211.441, *supra*, provides: "The juvenile court may, upon petition filed as provided in other cases of children coming under the jurisdiction of the court, terminate all rights of parents to a child when it finds that such termination is in the best interest of the child and one or more of the following conditions are found to exist: * * *

"(2) When it appears by clear, cogent and convincing evidence that for one year or more immediately prior to the filing of the petition

"(a) The parents have abandoned the child;

"(b) The parents have willfully, substantially and continuously or repeatedly neglected the child and refused to give the child necessary care and protection;

"(c) The parents, being financially able, have willfully neglected to provide the child with the necessary subsistence, education or other care necessary for his health, morals or welfare or have neglected to pay for such subsistence, education or other care when legal custody of the child is lodged with others; * * *."

■ A general finding that termination of parental rights is in the best interest of a child, in and of itself, is not sufficient cause to support an order of termination. Section 211.441, *supra*, also requires the petitioning party to meet the burden of showing one or more of the specific grounds. *In re M.J.M.,*

483 S.W.2d 795, 797[1, 2], 798[11, 12] (Mo. App.1972).

Accordingly, the question in this case is whether there is "clear, cogent and convincing evidence" that for one year prior to January 3, 1974, Mr. and Mrs. Trapp (a) abandoned their children, or (b) "willfully, substantially and continuously or repeatedly" neglected their children, or (c) "being financially able," neglected to pay for their support when their legal custody was lodged with others.

■ Abandonment within the meaning of Section 211.441.1(2)(a), *supra*, is a willful, positive act such as deserting the child, *H.G.R. v. Smith*, 483 S.W.2d 779, 782 (Mo. App.1972); willful delivery of a child with intention that the severance be permanent, *In re M.J.M., supra*, 483 S.W.2d l.c. 797; a voluntary and intentional relinquishment of custody of a child to another with intent to never again claim parental rights or perform parental duties, *In re Adoption of J_____*, 396 S.W.2d 257, 261 (Mo.App.1965).

■ The conduct of parents to constitute abandonment must have occurred during the year immediately preceding the filing of the termination petition. Abandonment may be repented and terminated within the period charged, and if resumption of the relationship is attempted in good faith, then the authority to terminate parental rights on that ground no longer exists. *In re Adoption of J_____, supra*, 396 S.W.2d l.c. 262; *T. H. v. Ambelang*, 497 S.W.2d 210, 212 (Mo.App.1973).

■ There is nothing in this record to show that Mr. and Mrs. Trapp abandoned their children during the year immediately preceding January 3, 1974, the date the termination petition was filed. To the contrary, the petition alleges, and the evidence shows, that the children were not in their custody at any time after January 2, 1973, when the children were placed in foster care without their parents' consent on a petition alleging neglect under Section 211.-

031, *supra*. The evidence also shows that the parents visited the children frequently while in foster care and attempted, repeatedly, to have the children returned to them. The court, in its own questioning of Mr. Trapp, recognized that he "never in fact abandoned his wife and family." The evidence further shows that caseworkers in the Department of Welfare, where temporary custody of the children had been lodged January 2, 1973, were working with Mr. and Mrs. Trapp toward restoration of their children's custody to them. Such a move was recommended by the department caseworker in the attempt of Mr. and Mrs. Trapp to secure custody of their children at the hearing of March 26, 1973. See and compare *H.G.R. v. Smith, supra; In re M.J.M., supra; T.H. v. Ambelang, supra; D_____ J_____ A_____ v. Smith*, 477 S.W.2d 718, 720[3] (Mo.App.1972); *S.K.L. v. Smith*, 480 S.W.2d 119, 124[9, 10] (Mo.App. 1972); *C.S. v. Smith*, 483 S.W.2d 790, 794[6, 7] (Mo.App.1972).

■ Willful neglect within the meaning of Section 211.441.1(2)(b), *supra*, excludes acts which occur because of events beyond control and not the fault of parents, *In re C_____*, 468 S.W.2d 689, 693 (Mo.App. 1971); the neglect alleged, in order to be willful, must be intentional, deliberate, and without just cause or excuse, *S.K.L. v. Smith, supra*, 480 S.W.2d l.c. 124; and where the parents' physical power and legal freedom to give care and support to their children are restricted by court order placing the children in the custody of others, the scope of acts of neglect is limited, *In re Taylor*, 419 S.W.2d 473, 476 (Mo.App.1967).

■ In the year immediately preceding January 3, 1974, the Trapp children were in custody of the Department of Welfare in different foster homes in separated locations. Robert was at the Joplin Diagnostic Center, then in Mercy Hospital, and later in a foster home. Despite this difficulty, Mrs. Trapp visited the child at all three locations and kept in touch with his condition and

treatment. Despite the added difficulty in living with her husband in Kansas City and in conflict with her employment, Mrs. Trapp also maintained visitation and concern with the other three children in their foster homes. Mr. Trapp, also despite these circumstances and the added difficulty of remaining employed, visited the children frequently and, when he could not, maintained knowledge of and interest in their situation through Mrs. Trapp. It is true that they did not make required financial contributions to pay for foster care of their children, but the difficulties incurred as a result of their incarceration and loss of jobs on that account and on account of garnishments furnished some showing of cause for failure to comply with the court's order as opposed to a finding of willful neglect. In this respect also, the Department of Welfare in March, 1973, had hope that Mr. and Mrs. Trapp would be able to reassume custody and care of their children; however, the incarceration, loss of jobs, and the court's position that the judgment must be paid before custody was returned to the parents, put that hope beyond realization. These circumstances are not clear, cogent, and convincing evidence of willful neglect. See and compare *In re M.J.M., supra*, 483 S.W.2d l.c. 798[5–8]; *S.K.L. v. Smith, supra*, 480 S.W.2d l.c. 124[9, 10]; *D____ J____ A____ v. Smith, supra*; *H.G.R. v. Smith, supra*; *T.M.S. v. Smith*, 488 S.W.2d 670 (Mo.App.1972).

■ With respect to the court's finding under Section 211.441.1(2)(c), *supra*, it is undisputed that Mr. and Mrs. Trapp were unemployed at the inception of the statutory one-year period prior to January 3, 1974; were still unemployed when they resumed living together January 27, 1973, and did not become employed until some time in February, 1973. Notwithstanding the court's finding in its order of February 27, 1973, requiring support payments, there is no showing on this record that Mr. and Mrs. Trapp had any financial ability to pay for support of their children for at least the first two months of the statutory one-year period.

Accordingly, the burden of showing Mr. and Mrs. Trapp to be "financially able" for one year prior to January 3, 1974, was not met. The court was therefore lacking in statutory power to decree a termination of parental rights on the ground that for one year prior to filing the petition to terminate, the parents, "being financially able," neglected to pay for support of their children while in custody of others. *In re Taylor, supra*, 419 S.W.2d l.c. 476[5].

Section 211.441.1(2)(d), *supra*, provides yet another ground for termination of parental rights, i. e., the parents are unfit by reason of debauchery, habitual use of intoxicating liquor or drugs, or lewd and lascivious behavior, which conduct is found to be seriously detrimental to the health, well-being, or morals of the child.

The court did not make any such finding and the record does not contain any evidence to support such a finding.

The juvenile officer, in support of the court's order, cites *Drake v. King*, 446 S.W.2d 455 (Mo.App.1969), and *White v. DeSpain*, 453 S.W.2d 697 (Mo.App.1970). Reference to those cases shows them inapposite on the facts.

The judgment terminating parental rights is reversed.

All concur.