[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. Nature and History of Proceedings
Romance M., born November 11, 1988, is the son of the respondent Gail M. (hereinafter "mother" or "Gail") and CT Page 1970 an unknown father. Allan D., Jr., born January 23, 1992, is the son of the respondents Gail M. and Allan D., Sr. (hereinafter "father" or "Allan, Sr.").
Romance was adjudicated neglected and uncared for by this court, Axelrod, J., on July 15, 1991, and committed to the Department of Children and Youth Services for a period not to exceed eighteen months. In a petition dated February 13, 1992, and amended effective May 29, 1992, the Department of Children and Youth Services, (hereinafter "the petitioner," "DCYS" or "the Department") now seeks to terminate mother's parental rights with respect to Romance for the following reasons: (1) The mother has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child; and (2) The child has been denied by reason of act or acts of commission or omission by the mother the care, guidance or control necessary for his physical, educational, moral or emotional well being.
With respect to Allan D., Jr., the Department filed co-terminous petitions dated January 27, 1992, four days after his birth, and amended effective May 29, 1992.[1] The petitioner claims that the child is neglected and uncared for in that he has specialized needs that his home cannot provide, that he is being denied proper care and attention and that he is living under conditions injurious to his well being. The petitioner also seeks termination of the respondents' parental rights on the basis of its claim that the child has been denied, by reason of act or acts of commission or omission by both parents, the care, guidance or control necessary for his physical, educational, moral or emotional well being. Although the petitioner represents that this situation has existed for a period of less than one year, it claims that the totality of circumstances surrounding the child indicate that a waiver by the court of the one-year requirement is necessary to promote his bests interests.
On December 9, 1988, the petitioner had obtained an order of temporary custody of Romance under 46b-129(b)(2) of the Connecticut General Statutes. He has remained in foster care since that date. On January 27, 1992, four days after CT Page 1971 Allan D., Jr.'s birth, the petitioner sought and received an order of temporary custody regarding him. Allan D., Jr. has remained in foster care since that date.
The respondent mother's involvement with the petitioning Department and with this court has been both extensive and tragic. A full recitation of the history of that relationship would require many, many pages. It is sufficient for the purposes of this introduction to note that mother's first three children, Jason, Tyrone and Justin, were the subjects of separate petitions seeking the termination of mother's parental rights, which petitions were granted by this court (Axelrod, J.) on July 15, 1991. Judge Axelrod's Memorandum of Decision granting those petitions and adjudicating Romance as neglected and uncared for sets forth much of that history. Although this court notes that Judge Axelrod's decision regarding the termination of mother's parental rights with respect to Jason, Tyrone and Justin is currently on appeal, it also notes that neither his factual findings with respect to mother's previous history with the Department and this court, nor his neglect/uncared for adjudication of Romance, have been attacked on appeal. This court has taken judicial notice of Judge Axelrod's decision.
The general authority of the Superior Court to terminate parental rights to a committed child such as Romance is now found in Connecticut General Statutes17a-112(b), which provides, in pertinent part, as follows:
 The superior court upon hearing and notice . . . may grant such petition if it finds, upon clear and convincing evidence, that the termination is in the best interest of the child and that . . . with respect to any non-consenting parent, [the circumstances giving rise to the need for termination have existed] over an extended period of time, which, except as provided in subsection (c) of this section, shall not be less than one year.
The question of termination of parental rights was recently discussed in the case of In Re Jessica M., 217 Conn. 459
CT Page 1972 (1991), where the court, at pages 464, 465 and 466, stated in part as follows:
 Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); see also In Re Juvenile Appeal (83-CD), 189 Conn. 276, 295, 455 A.2d 1313 (1983) (noting that "it is both a fundamental right and the policy of this state to maintain the integrity of the family"). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life." Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
. . .
 As a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for CT Page 1973 termination. In re Barbara J., 215 Conn. 31, 45, 574 A.2d 203 (1990); In re Luis C., 210 Conn. 157, 165, 554 A.2d 722 (1989); In re Juvenile Appeal (Anonymous), supra, 177 Conn. 671-72; see also O. Ketcham and R. Babcock, "Statutory Standards for the Involuntary Termination of Parental Rights," 29 Rutgers L. Rev. 530, 539 (1976). We have observed, however, that "(i)nsistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child." In re Juvenile Appeal (Anonymous), supra, 177 Conn. 672. A child, no less than a parent, has a powerful interest in the preservation of the parent-child relationship. Santosky v. Kramer, supra, 760.
In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition by clear and convincing evidence. In re Theresa S., 196 Conn. 18
(1985). The grounds alleged for termination regarding Romance are based on Connecticut General Statutes17a-112(b)(2) and (3). Those regarding Allan, Jr., who is not committed to DCYS but for whom termination is sought pursuant to the "co-terminus" petitions provisions of17a-112(e), are based on 17a-112(b)(3).
17a-112(b)(2) provides for termination when:
 . . . the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a CT Page 1974 responsible position in the life of the child. . .
 17a-112(b)(3) provides for termination when:
 The child has been denied by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well being. . .
If the petitioner meets its burden, the court must then decide whether termination of parental rights is in the best interest of the child, and in doing so, the court must consider and make findings in writing of the six factors set out in Connecticut General Statutes 17a-112(d). If the court decides it is in the best interest of the child to terminate parental rights, the petition should be granted and the petitioner appointed the statutory parent of the child. The court does not consider the "child's best interests" unless grounds for termination have been proven by clear and convincing evidence.
The adjudication on the petition may consider facts as of the last day of filing or amending the petition, which in this case is May 29, 1992. In deciding the disposition, the court may consider facts as of the last date of trial including those facts contained in the mandatory social study. In re Juvenile Appeal, 192 Conn. 254 (1984).
Where neglect/uncared for and termination petitions are coterminously filed under 17a-112(e) of the Connecticut General Statutes, as is the case with Allan, Jr., the court is required to proceed in three separate stages as follows.
A. Adjudication of the Neglect/Uncared for Petition
The court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. In Allan's case, this is May 29, 1992. If the petitioner's evidence does not support such a finding, both petitions must be dismissed since both are based on the same alleged facts. If the court finds the child to have been neglected or CT Page 1975 uncared for, disposition will be deferred until a decision is rendered on the termination petition.
B. Adjudication of the Termination Petition
The court must next determine whether the evidence provides clear and convincing evidence that any pleading ground exists to terminate the parent's rights, as of May 29, 1993 in this case. If no such ground is found, the court must return to the neglect petition to consider an appropriate disposition.
If at least one ground to terminate is found, the court must move to the third stage.
C. Disposition of Both Petitions
If grounds are found to adjudicate the child neglected and/or uncared for, and to terminate parental rights, the court must then consider whether the facts as of the last day of the hearing, in this case, November 30, 1992, establish by clear and convincing evidence, after consideration of the six factors enumerated in 17a-112(d) of the Connecticut General Statutes, that such termination is in the child's best interest. It must also find, in this case, that under the totality of circumstances, a waiver of the "one year rule" is necessary to promote Allan D., Jr.'s best interests. If the court does not find that the child's best interests would be served by terminating the parents' rights, it must return to, and dispose of, the neglect/uncared for petition. If the court does find that termination serves the child's best interests, an order should issue terminating the parents' rights and appointing the Commissioner of the Department of Children and Youth Services as statutory parent.
II. Findings of Fact
Trial was held on all of the above petitions, as amended, on October 5, October 22, October 26, October 30, November 20 and November 30, 1992. The petitioner introduced testimony and exhibits through the following witnesses: Ann Marie Daley, Michelle Murphy and Kimberly Blackburn, DCYS social workers; Mark Mercurio, M.D., pediatrician from Lawrence Memorial Hospital, Mr. George Trabakoulos, a taxi CT Page 1976 driver; Sergeant Victor Johnson, Officer George Potts, Officer Wayne Monte, and Captain William Gavitt of the New London Police Department; Victoria Sullivan of the office of Adult Probation; Robert Tafuro, therapist at SCADD; Margaret Courtney, rehabilitation counselor at Boneski Treatment Center, Janie L., Romance's former foster mother; Louise B., Romance's current foster mother; Kim A., Allan's foster mother; Richard Sadler, M.D., court-appointed psychiatrist and Dr. Robert Meier, a clinical psychologist. The petitioner also introduced numerous reports and other documents.
The respondents presented no witnesses.
Ann Marie Daley was the DCYS social worker assigned to Romance's case from the time of the Department's initial involvement with him in early December of 1988 through the conclusion of the trial in 1991 as a result of which he was found to be neglected and uncared for. Her goal throughout was to attempt to reunify the family and in particular to get mother to enter into counseling and to deal with her drinking problem. Daley made numerous referrals for counseling and treatment, but mother generally ignored these efforts. She continued to drink, and several scheduled visits with Romance and his older siblings had to be aborted because she would come to these visits intoxicated. While intoxicated, she would occasionally threaten Daley. On one occasion, she even came to court intoxicated during the trial that led to Romance's neglected and uncared for adjudication.
Romance views his foster mother as "momma" and sees Gail only as "a person who visits." In Daley's judgment, mother was even less able to assume a responsible role in Romance's life at the end of her involvement with the case than at the beginning.
DCYS social worker Michelle Murphy's involvement with the case overlapped that of Daley and her experience paralleled Daley's in virtually every respect. In particular, mother continued to drink and to come to visits with Romance while under the influence.
In the meantime, mother gave birth to another child, Tiara, on December 12, 1990. Testimony given by Murphy, by Mark Mercurio, M.D., a neonatologist affiliated CT Page 1977 with Lawrence Memorial Hospital, by George Trabakoulos, the taxi driver who drove mother from her home to that of a friend on January 12, 1991, and by Detective Captain William Gavitt and Sergeant Victor Johnson of New London Police Department, all established that on January 12, 1991, after having drunk champagne and fallen asleep in bed with young Tiara, then only a month old, mother awoke to find the baby blue and apparently lifeless. She called a cab and took the child to a friend's house, rather than a hospital. Only then did she call 911. By the time she arrived at the hospital, Tiara was in cardiac arrest and was pronounced dead a half-hour later. The cause of death was indicated as sudden infant death syndrome.
Victoria Sullivan, mother's probation officer in connection with two convictions for reckless endangerment and one for carrying a dangerous weapon, testified that mother complied with a condition of her probation that she attend the 28-day inpatient treatment program at Boneski Treatment Center. Despite this treatment, however, mother did not change her substance abuse habits.
Officer George Potts of the New London Police Department described an incident on May 10, 1992, when he was dispatched to Lawrence Memorial Hospital regarding a trespass complaint. He found mother there, yelling, screaming and highly intoxicated. She had a "very strong odor" of alcohol on her and appeared to him to be "out of it."
Officer Wayne Monte of the New London Police Department described an April 14, 1992 incident in which Allan, Sr. had made a complaint about mother arising out of a domestic dispute. Allan, Sr. complained that mother was drunk and was going to slash his tires. Monte testified that mother appeared intoxicated and excited, with slurred speech and staggering gait. She could not understand directions and repeatedly asked why she was being arrested. He could smell alcohol on her breath.
Robert Tafuro, a substance abuse counselor at SCADD, described two admissions at that program. She left the first on her own, having not completed the program. The second time, she was discharged early because she was uncooperative. At each discharge, her prognosis was CT Page 1978 "guarded," meaning that there was not a very good chance of her remaining abstinent. Similarly, Margaret Courtney described mother's stay at the Boneski Treatment Center and described her prognosis on discharge as "not poor," but not better than that, either. Her addiction level to alcohol and crack cocaine was classified as "serious."
The three foster mothers who testified, Kim A., Louise B. and Janie L., all described a pattern of missed visits, visits while intoxicated and a decline in the relationship between mother and her children. Anderson testified that the father seems not to know how to behave with Allan, Jr. She described incidents of inappropriate teasing and tossing, but also noted that he has responded to efforts to correct his behavior. He and mother sometimes argue in the child's presence, usually not about serious matters. Once, in anger, he snatched Allan, Jr. out of mother's hands.
Although the father has represented himself as a non-drinker, an arrest for operating under the influence and subsequent blood alcohol content tests over the legal limit suggested that this representation was not entirely accurate.
Dr. Sadler, based on his evaluations of March 8 and July 12, 1992, favors termination of mother's parental rights as to both children because of her excessive drinking, personality disorder and utter failure to recognize the consequences of her actions and to learn from them. He feels that she considers herself not at all responsible for any of the misfortunes of her children. He believes that her eager participation in visits with the children, evaluations and other activities related to the children is solely a reflection of her own needs and not a recognition of her children's. She will not change her behavior for their sake, and there is virtually no likelihood of an alteration in her pattern of behavior over the next three to five years, at a minimum.
Dr. Sadler found father more difficult to evaluate because of a lack of a prior outside history and father's own superficial description of himself. He was concerned about father's references to need for corporal punishment for Allan, Jr., reflecting not hostility, but rather "an odd idea" about how discipline should take place and under what CT Page 1979 circumstances. Because the father was apparently a non-drinker, employed, religious and family-oriented, and because of the apparent stability of his relationship with mother, Dr. Sadler initially recommended against terminating father's parental rights. Confronted at trial with the one documented operating under the influence incident, with evidence that father's extended family was not as available to assist in child care as he had suggested, with father's complaints to the police about mother and subsequent brief separation from her, and with other similar factors of which Dr. Sadler had not been aware, Sadler opined that if true, these added to his concerns but might not change his overall evaluation. If father continues to live with mother, he would want to evaluate further, and if living independently from mother, there would be no basis for recommending termination. He did, however, recommend commitment of Allan, Jr. to the Department.
DCYS worker Kimberly Blackburn testified to a continuing pattern of missed visits and reports of mother's intoxication during the period during which she has been assigned as the family's social worker. In the three weeks prior to the final hearing in this case, neither parent attended scheduled visits with the children. Father has been hostile in recent encounters. Blackburn is concerned about father's plan to have mother be the primary caretaker for his son, despite his inability to get her to stop drinking.
Robert Meier, Ph.D., a clinical psychologist who evaluated mother three times in 1989 and 1990, testified to his diagnosis of mother as having a personality disorder. Her prognosis is poor. He also diagnosed her as having hallucinations, increasing with stress and possibly related to substance abuse. Finally, his third diagnosis was of substance abuse. He noted that the personality disorder is characterized by resistance to treatment, exacerbated in this case by substance abuse. Occasional reported psychotic episodes are probably a part of her personality disorder.
It was Meier's belief that these diagnoses, and especially the substance abuse diagnosis, would place a child at risk. Substance abuse and the deterioration of behavior and responsibility go hand in hand. Asked whether the presence of father in the home might change things, Meier responded that it depends on whether the person is an CT Page 1980 enabler. The addition of family members in and of itself adds nothing of significance to the underlying addiction problem. Evidence of cocaine and alcohol abuse, as was reported during mother's pregnancy with Allan, reinforces this conclusion. Dr. Meier testified that the best predictor of behavior in the future is the pattern of behavior over time, and mother's behavior in the past strongly indicates a lack of likelihood of her ability to rehabilitate herself.
Current research suggests that a child under the age of three should not spend more than a year in foster care, if at all possible. A child over three should not spend more than two years in foster care. Indeed, Goldstein, Solnit, et al recommend not more than six months in foster care for a child under three years of age.
On the basis of the testimony and exhibits, the court finds that mother suffers from a personality disorder and chronic substance abuse. She has been utterly unable, unwilling, or both, to curb her use of alcohol and illicit drugs. Occasional brief periods of stability in her life have quickly deteriorated into more protracted and disastrous periods of substance abuse, often accompanied by institutionalization, criminal charges and convictions, abject failure to follow through with court-ordered expectations and the recommendations of service providers, lack of cooperation and even hostility toward the Department of Children and Youth Services and the like. Most significantly, her behavior has resulted in inconsistent and inappropriate behavior toward her children, with unremittingly tragic consequences for all of them.
Yet, as the children's attorney argues most forcefully in her trial brief, "neither the possible termination of her rights to the three older boys, nor the death of her daughter, nor the removal of Romance and Allan, Jr. from her custody as infants, have been factors to sufficiently motivate [mother] to permanently end the cycle of destruction she has inflicted on herself and her family. To the present day, she remains an active alcoholic, is inconsistent and incooperative of DCYS, service providers and foster parents, fails to follow through on therapy and after care recommendations, and is at times inappropriate in the presence of the children. She has been through a number of substance abuse programs (SCADD, Boneski, Care Clinic, CT Page 1981 Lawrence Memorial Hospital) with no lasting results."
Father, although occasionally exhibiting inappropriate behavior with Allan, Jr. and often refusing to cooperate with DCYS, comes through as an individual interested in his son's well being. It is abundantly clear, however, that at the present time he lacks the appropriate skills to be even a minimally acceptable parent to his son. His stated intention to permit mother to be the primary care giver is, perhaps, a recognition of his own limitations of a parent, but his willingness to entrust his son to mother also shows extraordinarily poor judgment.
III. Neglected/Uncared For Adjudication Re: Allan D., Jr.
The petitioner asks the Court to adjudicate Allan, Jr. as neglected because he "is being denied proper care and attention, physically, educationally, emotionally or morally or . . . is being permitted to live under conditions, circumstances or associations injurious to his well being." Connecticut General Statutes 46b-120. Allan was removed from his parents' care within four days after his birth. The petitioner appears to concede that it has offered no evidence of actual neglect by either respondent. Rather, it has proceeded under the theory of predictive or prospective neglect, based on its contention that "when the parents are unable to provide the child with even basic care, thereby depriving the child of the care necessary for the child's physical or emotional well being, the petitioner is justified in taking preventive measures necessary to protect the child and safeguard his well being." Petitioner's Trial Brief,
Trial courts in Connecticut have found, and Appellate Courts in other states have upheld, adjudications of neglect based on findings that the child or children will be neglected. See e.g., In re: Anthony C. and Joey C., November 5, 1992, Samuel Goldstein, Judge; In re: Iris N. And Marisela M., July 18, 1988, Frederica Brenneman, Judge; In re: Loliesha O. (1982), Thomas D. Gill, Referee; In re: William B., 533 A.2d 16, 20 (Md.App. 1987); In re: Custody of a Minor, 389 N.E.2d 68, 73 (Mass. 1979) ("the court need not wait until it is presented with the maltreated child before it decides the necessity of `care and protection.'" Where there has been evidence of prior neglect or abuse of siblings, the courts have even allowed a finding of CT Page 1982 prospective neglect to serve as a basis for termination of parental rights. See e.g. In re: Jessica R. (1990), Frederica Brenneman, Judge; Matter of T.Y.K., 598 P.2d 593
(Mont. 1979); In re: K.D.E., 210 N.W.2d 907 (1973); In re: Interest of H.E.B, 743 S.W.2d 875 (Mo.App. 1987).
Morever, under Connecticut General Statutes46b-129(b), the petitioner must simultaneously file petitions of neglect in an application for a show cause hearing or an order of temporary custody. Thus, there is an implication in the statute that evidence sufficient to support an order of temporary custody, i.e. that a child is in immediate physical danger, but not as yet physically harmed, may also be sufficient to support a finding of neglect.
The respondents incorrectly suggest that In re: Kelly S., 29 Conn. App. 600 (1992), has put the issue of "predictive neglect" to rest. That case stands for the proposition that "predictive neglect" may not form the basis of any of the statutory grounds for termination of parental rights. Upholding the adjudication of the child in that case as uncared for, the Appellate Court never reached the issue of "predictive neglect" as the basis of a neglect petition.
This case, however, appears to be an inappropriate vehicle for the raising of this difficult and important issue. The petition involving Allan does not, in fact, allege that the child "would be" or "will be" permitted to live under conditions . . ., but rather that he "is living" under conditions. . . . Thus, predictive neglect has not been directly alleged in the pleadings. Compare, for example, In Re: Jessica R., supra, in which the petitioner did allege that a child "would be" neglected. Although references were made to the concept during the course of the trial, and although the issue has been addressed in the post-trial briefs, it appears to this Court that it should not consider the issue because it has not been alleged in the petition. The petitioner admittedly having presented no evidence to establish that Allan "is living" under conditions, circumstances or associations injurious to his well-being or is being denied proper care and attention, physically, educationally, emotionally or morally, the Court finds that the petitioner has not proved neglect by a preponderance of the evidence. CT Page 1983
The petitioner has proved by a fair preponderance of the evidence, however, that Allan, Jr. is uncared for within the meaning of the statutes. That a "normal infant" has "specialized needs" has long been recognized by the courts of this state. In re: Carl O., 10 Conn. App. 428
(1987). The evidence is overwhelming that both mother and father lack the basic skills and abilities required to meet an infant's needs. Mother's chronic alcoholism, her documented failures with Allan's older siblings, and her utter inability to reform herself make it clear that she cannot provide for an infant's specialized needs.
Father is by no means in the same category as mother with regard to his documented inability to care for a child, but the petitioner has nonetheless proved by a preponderance of the evidence his lack of knowledge of the skills required for the care of an infant or a young child. This contention has been well documented through the testimony of, Beyond this, he has made clear his intention to have mother be the primary caretaker for Allan, Jr., underscoring both his own inability to provide for Allan, Jr.'s specialized needs and his inability to recognize mother's danger to her children.
IV. Termination Re: Allan, Jr.
Having found Allan, Jr. to be uncared for, the court must next consider termination of the parental rights of the respondents. Shortly after the conclusion of the trial in this case, however, the Connecticut Appellate Court decided In re: Kelly S., 29 Conn. App. 600 (1992). That decision has now made it clear that whatever the future may hold for the concept of predictive neglect in commitment proceedings, Connecticut General Statutes 45a-717(a)(2) does not permit the termination of parental rights "based on speculation as to what acts may befall a child." In re: Kelly S., supra, at 614. The petitioner here has alleged that Allan, Jr. "has been denied, by reason of an act or acts of commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well being. . . ." Allan was taken from his parents and his custody given to the petitioner on a temporary basis four days after his birth. He continues in the petitioner's custody to this day. The petitioner concedes in its trial CT Page 1984 memorandum that it has offered no evidence whatever of such an act or acts of commission or omission on the part of either respondent. The termination petition with respect to Allan, Jr. is therefore dismissed.
V. Termination Re: Romance
Romance was adjudicated as neglected and uncared for on July 15, 1991. The petitioner has claimed that mother has failed to rehabilitate herself since then.
Personal rehabilitation means "the restoration of a parent to his or her former constructive and useful role as a parent." In re: Migdalia M., 6 Conn. App. 194, 203,504 A.2d 533 (1986), cert. denied 119 Conn. 809, 508 A.2d 770. "Failure to rehabilitate" requires proof by the petitioner that "the parents of a neglected or uncared child have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in their child's life." In re: Rayna M., 13 Conn. App. 232 (1987). The statute requires the Court to analyze the level of the parents' rehabilitation as it relates to the particular child. In re: Luis C., 210 Conn. 157,167 (1989). The reasonableness of the time period within which rehabilitation is sought to be accomplished is a question of fact for the court. In re: Davon M., 16 Conn. App. 693,695-6 (1988).
Since the adjudication, mother has been arrested twice for incidents involving her intoxication. Although she briefly attended various mandated substance abuse programs, the evidence is overwhelming that she nonetheless continued to drink. Moreover, she tested positive for cocaine on several occasions while attending the Lawrence and Memorial Hospital hospitalization program, left SCADD in New London prematurely on one occasion and was discharged on another because of her uncooperative behavior. Although she completed a 28-day inpatient program at Boneski Treatment Center, she continued to drink thereafter, and was intoxicated during several visits to the foster homes of all of her children, including Romance.
The Department has proved by clear and convincing evidence that mother has failed to achieve such a degree of CT Page 1985 rehabilitation as would encourage the belief that she can assume a responsible position in the life of her son, Romance, within a reasonable period of time.
Petitioner also alleges acts of omission or commission that deny Romance the care, guidance or control necessary for his physical, educational, moral or emotional well being. The petitioner has proved repeated acts of commission, primarily repeated acts of substance abuse, that have had the effect of denying her son the opportunity and the right to have a nurturing family that he can call his own. Similarly, her abject failure to cooperate with substance abuse treatment and also to address underlying mental health issues constitute acts of omission which lead to the same result.
The Court therefore finds that the Department has proved by clear and convincing evidence that mother has denied Romance, by her acts of omission and commission, the care, guidance or control necessary for his physical, educational, moral or emotional well being. These acts have occurred over an extended period of time well in excess of one year.
VI. Best Interests
Having found by clear and convincing evidence that the statutory grounds alleged by the petitioner for the termination of mother's parental rights with regard to Romance have been proved, the Court must consider and make findings on each of the six enumerated criteria of Connecticut General Statutes 17a-112(d).
1. Services Offered: The Department has made numerous referrals for mother, including parenting programming, substance abuse programs, mental health counseling, visitation opportunities and transportation.
2. Court Orders. With regard to the court-ordered expectations entered on September 10, 1991 concerning Romance:
 a. Mother appears to have kept her appointments with the Department. She has kept the Department and her CT Page 1986 attorney advised of her whereabouts.
 b. Mother was required to visit Romance as often as permitted by the Department, and at least once per week. She has failed to do this on numerous occasions, with no notice being given to the Department or the foster mother in advance of those visits which were missed. Moreover, when she did attend visits, she was frequently intoxicated.
 c. Mother did attend parenting classes as required, but she has shown no evidence of having profited from them.
 d. Mother did attend sessions at the Care Clinic and at a mental health clinic, as required, but her attendance was sporadic and was ultimately unsuccessful.
 e. Mother did submit to random urine testing whenever she was involved with substance abuse treatment, but a number of those screens have proved positive for alcohol or drugs.
 f. Although mother provided a release of information for the Care Clinic, she did not provide a release for her mental health counseling.
3. Feelings and Emotional Ties. The evidence was undisputed that Romance does not recognize Gail as his mother. Louise B., his foster mother, is clearly his psychological parent.
4. Age of the Child. Romance was born on November 11, 1988. He was therefore more than three-and-a-half years old as of the date of the final amendment of the instant petition, and he was four years old CT Page 1987 by the conclusion of the trial. All but three weeks of his life have been spent in foster care, and the evidence presented through the testimony of Dr. Sadler and Dr. Meier is that this is already too long a period of time for a child to have to spend in foster care.
5. Efforts to Adjust. Mother has made virtually no effort worthy of the name to adjust her circumstances at any time since Romance's birth, and, in particular, since Romance was adjudicated as neglected and uncared for. Her completion of the 28-day inpatient program at Boneski probably represents her greatest single effort to change her ways, but even that involvement has not borne fruit.
6. Interference with Relationships. No evidence was presented to suggest that the petitioner or any other individual or agency unreasonably interfered with mother's ability to maintain her relationship with her son. Although mother is clearly not a wealthy woman, the petitioner was able to offer a variety of services at no cost to mother. Her failure to capitalize on those services and her failure to effect unification with her son cannot be said to have been influenced by economic factors.
The evidence is as clear as it could possibly be that the best interests of Romance M. are served by the termination of his mother's parental rights.
VII. Conclusion
Judgment may therefore enter finding Allan D., Jr. to be uncared for, and committing him to the Department of Children and Youth Services for a period of up to eighteen months. The petition seeking a termination of mother and father's parental rights with respect to Allan, Jr. is dismissed.
The petition seeking the termination of mother's parental rights with respect to Romance M. is hereby granted, and judgment may therefore enter terminating Gail M.'s parental rights with respect to Romance. Pursuant to Connecticut General Statutes 17a-112(f), it is further ordered that the Commissioner of the Department of Children and Youth Services be appointed statutory parent so that Romance can be placed in adoption. The statutory parent CT Page 1988 shall report to the Court within ninety days on a case plan for the child and shall then submit reports at least every twelve months thereafter until such time as any proposed adoption plan has become final.
VIII. Appeal
The respondent mother shall have twenty days from the date of this judgment in which to take an appeal. For reasons not relevant to the decision in this case, the respondent mother's trial counsel has indicated his unwillingness to represent her on appeal, a decision in which the respondent mother has acquiesced. The respondent has written directly to the court requesting the appointment of new counsel for the appeal, and the court hereby orders the clerk, effective upon the date of filing of this decision, to appoint new counsel from the panel of attorneys approved for appointment in child protection cases.
That new attorney may act as appellate counsel at public expense until all appellate process is completed. Practice Book Section 4017. Because of the lengthy history and complexity of this case, however, and the need of new counsel to act expeditiously in order to meet the requirements of the twenty day appeal period, the court orders respondent mother's trial counsel to be available to new counsel on a consultant basis, and it authorizes him to bill for his services as a consultant at standard court-appointed rates.
If, however, in the exercise of professional judgment as an officer of the Superior Court, the new attorney declines to prosecute such appeal because, in the attorney's opinion, it lacks merit, he or she is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the period in which to appeal to the maximum of forty days as permitted by law. Practice Book Section 4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The mother will then be informed by the court clerk that she has the balance of the forty days in which to secure counsel for the purpose of CT Page 1989 taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1965).
If no appeal has been filed by the end of the extended appeal period, the right to prosecute an appeal will be ended and the termination of parental rights made final.
Dated at Montville this 23rd day of February 1993.
Jonathan E. Silbert, Judge